# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

PLANNED PARENTHOOD OF
WISCONSIN, INC., on behalf of itself, its
employees, and its patients; DR. KATHY
KING, NATALEE HARTWIG, SARA
BERINGER, and KATHERINE MELDE, on
behalf of themselves and their patients,

*Plaintiffs*,

v.

JOSHUA KAUL, Attorney General of the
State of Wisconsin, in his official capacity;
ISMAEL OZANNE, District Attorney for
Dane County, in his official capacity and as
representative of a class of all District
Attorneys in the State of Wisconsin, in their
official capacity; DAWN CRIM, Secretary of
the Department of Safety and Professional
Services, in her official capacity; KENNETH
B. SIMONS, Medical Examining Board
Chairperson, in his official capacity;
TIMOTHY W. WESTLAKE, Medical
Examining Board Vice Chairperson, in his
official capacity; MARY JO CAPODICE,
Medical Examining Board Secretary, in her
official capacity; ALAA A. ABD-ELSAYED,
DAVID A. BRYCE, MICHAEL CARTON,
PADMAJA DONIPARTHI, RODNEY A.
ERICKSON, BRADLEY KUDICK, LEE
ANN R. LAU, DAVID M. ROELKE,
ROBERT L. ZOELLER, Medical Examining
Board Members, in their official capacity;
PETER J. KALLIO, Board of Nursing,
Chairperson, in his official capacity;
PAMELA K. WHITE, Board of Nursing Vice
Chairperson, in her official capacity;

CIVIL ACTION
Case No. 19-cv-38

**COMPLAINT FOR
DECLARATORY JUDGMENT
AND INJUNCTIVE RELIEF**

ROSEMARY DOLATOWSKI, JENNIFER
EKLOF, ELIZABETH S. HOUSKAMP,
SHERYL A. KRAUSE, LILLIAN NOLAN,
LUANN SKARLUPKA, Board of Nursing
Members, in their official capacity,

*Defendants.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

JURISDICTION AND VENUE ............................................................................... 4

PARTIES .............................................................................................................. 5

I.     PLAINTIFFS .................................................................................................. 5

II.    DEFENDANTS ............................................................................................. 7

FACTS ................................................................................................................. 9

I.     EARLY ABORTION PRACTICE AND SAFETY ............................................. 9

II.    THE "PHYSICIAN-ONLY" RESTRICTION ................................................. 11

    A.   The Laws and Regulation Constituting Wisconsin's Physician-Only
        Restriction ......................................................................................... 12

    B.   The Physician-Only Restriction is Medically Unjustified Given the Scope of
        Practice of Advanced Practice Nurses in Wisconsin ............................... 13

    C.   Studies Establish That Advanced Practice Nurses Can Provide Safe, Effective
        Abortion Care ..................................................................................... 20

    D.   Leading Medical and Public Health Authorities Support the Provision of
        Abortion Care by Advanced Practice Nurses ....................................... 22

III.   THE "SAME-PHYSICIAN" RESTRICTION ................................................. 24

    A.   The Laws Constituting Wisconsin's Same-Physician Restriction ........................ 25

    B.   The Scope of Practice of Physicians in Wisconsin ............................... 25

    C.   There is No Medical Need for the Prescribing Physician to Be the One to Perform
        a Pre-Abortion Physical Examination ................................................. 26

IV.   THE "PHYSICAL-PRESENCE" RESTRICTION ......................................... 27

    A.   The Law Constituting Wisconsin's Physical-Presence Restriction ...................... 28

    B.   There is No Medical Need for the Prescribing Physician to be Physically Present
        in the Room When a Woman is Given Drugs for Medication Abortion Care ...... 28

    C.   The Physical-Presence Restriction is Also Medically Unnecessary Because a
        Clinician Can Supervise a Medication Abortion Using Telemedicine ................ 30

i

V.    THE IMPACT OF WISCONSIN'S ACCESS RESTRICTIONS ON
      PLAINTIFFS AND THEIR PATIENTS ........................................................................ 39

      A.    Because of the Access Restrictions, Wisconsin Women Often Have to Travel
            Long Distances to Access Abortion Care, Which Many Cannot Afford.............. 41

      B.    Wisconsin Women Can Access Abortion Care Only on a Limited Number of
            Days, Causing Delays and Other Forms of Harm, and Preventing Some Women
            from Accessing Abortion Care at All .................................................................... 44

      C.    If Not for the Access Restrictions, Women Would Have Greater Access to
            Medication and Aspiration Abortion Care Throughout the State........................ 47

CLAIMS FOR RELIEF ....................................................................................................... 48

PRAYER FOR RELIEF ....................................................................................................... 50

Plaintiffs, by and through their undersigned attorneys, bring this complaint against the above-named Defendants and in support thereof allege the following:

## PRELIMINARY STATEMENT

1.      This is an action for declaratory and injunctive relief challenging the constitutionality of several Wisconsin laws and a related regulation that, as described below, individually and in combination, unconstitutionally restrict access to abortion services within the State of Wisconsin (the "**Access Restrictions**").  Through the **Access Restrictions**, Wisconsin has arbitrarily limited the class of medical professionals authorized to provide abortion services and has placed additional unique and unjustifiable restrictions on women's ability to obtain medication-induced abortions ("medication abortions"), which Plaintiff Planned Parenthood of Wisconsin, Inc. ("PPWI") offers to patients during the first 10 weeks of pregnancy.  Each of the **Access Restrictions** substantially curtails the availability of abortion care within the State of Wisconsin (the "State") without any legitimate, rational medical justification for doing so.  Each provision, therefore, imposes an undue burden on Wisconsin women and harms the health care providers who care for them.

2.      *First*, Wis. Stat. § 940.15(5) and Wis. Admin. Code Med. § 11.03 prohibit anyone other than a physician from performing a medication or surgical abortion (the "**Physician-Only Restriction**").  This means that advanced practice nurses—such as certified nurse practitioners and certified nurse-midwives—who, based on their advanced education, training, experience, and licensing would otherwise be permitted to perform medication or aspiration abortions (a surgical abortion procedure performed early in pregnancy), are arbitrarily barred from doing so.

3.      Wis. Stat. § 940.15(5) makes it a felony to perform an abortion in violation of the **Physician-Only Restriction**.

1

4.     The **Physician-Only Restriction** is a unique and unwarranted restriction on the care that advanced practice nurses are otherwise permitted to provide under Wisconsin law, which ranges from delivering babies, to performing endometrial biopsies (the removal of tissue from the uterine lining), to providing miscarriage management, to independently prescribing medications—health care services that are equally complex as, or more complex than, aspiration and medication abortions.  Indeed, advanced practice nurses in Wisconsin can and do care for a woman experiencing a miscarriage by performing surgical procedures and prescribing drugs that are *identical* to those used for aspiration and medication abortions.  As described herein, peer-reviewed medical literature uniformly finds that advanced practice nurses can safely and effectively provide abortion care, and venerable medical authorities have concluded that laws prohibiting advanced practice nurses from providing this care are medically unfounded.

5.     *Second*, Wis. Stat. § 253.105(2)(a), in combination with Wis. Stat. § 253.10(3)(c)(1), mandate that a woman may not be given an abortion-inducing drug for a medication abortion unless the same physician who prescribes the drug has also conducted a pre-abortion physical examination of the woman at least 24 hours before the medication abortion is induced (the "**Same-Physician Restriction**").

6.     *Third*, Wis. Stat. § 253.105(2)(b) requires that the same physician who conducts the pre-medication abortion physical examination and prescribes the abortion-inducing drug must also be in the same room as the woman when she is "given" the abortion-inducing drug (the "**Physical-Presence Restriction**").

7.     Due to the mandatory 24-hour waiting period between the physical examination and medication abortion inducement, the practical effect of the **Same-Physician Restriction** and

2

the **Physical-Presence Restriction** is that the same physician must see the patient in person on two separate days.

8.      Wis. Stat. § 253.105(1)–(3) makes it a felony to perform an abortion in violation of the **Same-Physician Restriction** or the **Physical-Presence Restriction**.

9.      Like the **Physician-Only Restriction**, the **Same-Physician Restriction** and **Physical-Presence Restriction** are unique restrictions on the care that medical professionals normally provide, and they lack any medical basis.  There is no context, other than medication abortion, in which the State requires a medical professional (here, a physician) to perform a preliminary physical examination and then dictates that only that very same person may prescribe a particular medication for the patient.  Wisconsin law does not even require the physician who performs a surgical abortion also to conduct the woman's pre-abortion physical examination.  Nor is there any other instance when the State mandates that the very same person who prescribes a drug be present when the drug is given to the patient.

10.      The **Physical-Presence Restriction** also unjustifiably prevents the provision of medication abortion through telemedicine (*i.e.*, video conferencing or web-based communication tools that enable a medical professional in one location to review medical records and consult with a patient and medical staff in a second location), even though studies consistently find that medical professionals can safely and effectively prescribe drugs and provide treatment, including medication abortions, through the aid of telemedicine.

11.      Given the limited number of physicians willing and able to provide abortion in Wisconsin, the three **Access Restrictions**—individually and in combination—significantly constrain the availability of abortion services in the State.  There are only four outpatient clinics

3

in three cities that offer abortion services in Wisconsin, and the only clinic outside of Milwaukee and Madison that provides abortions can do so on only a handful of days per month.

12.     Consequently, women seeking abortions are faced with significant and costly travel burdens and delayed access to care, forcing some to obtain abortions at a more advanced stage of pregnancy (in certain instances, when a medication abortion is no longer a viable option and the abortion must be performed surgically) and preventing others from obtaining an abortion altogether.  These onerous burdens, which fall disproportionately on poor women in the State, far outweigh the nonexistent health justifications behind the **Access Restrictions**.

13.     If not for the **Access Restrictions**, Plaintiff PPWI, which currently operates three of the State's four outpatient abortion clinics, would be able to offer abortion services at more of its clinics throughout the State, lessening the hardships imposed by these laws on Wisconsin women.  PPWI already has advanced practice nurses at its other clinics who have the requisite training, or could shortly be trained, to provide medication and aspiration abortions.

14.     To prevent Wisconsin's medically unjustified restrictions from inflicting further harm on their patients, Plaintiffs bring this civil rights action pursuant to 42 U.S.C. § 1983 on behalf of themselves, other physicians and advanced practice nurses who work at PPWI's clinics, and their patients.  The three **Access Restrictions** impose an undue burden on abortion access in violation of Plaintiffs' patients' Fourteenth Amendment liberty and privacy rights and likewise violate the equal protection rights of Plaintiffs and their patients.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

16.     Plaintiffs' action for declaratory judgment and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202 and by Rules 57 and 65 of the Federal Rules of Civil Procedure.

17.    Venue in this District is proper under 28 U.S.C. § 1391(b) because certain of the Defendants, who are sued in their official capacities, carry out their official duties at offices located in this District.

## PARTIES

### I.    PLAINTIFFS

18.    Plaintiff PPWI is a non-profit corporation incorporated in Wisconsin that operates 21 health centers within the State of Wisconsin.

19.    PPWI provides reproductive health and other critical preventive health services to patients throughout Wisconsin.  These services include, but are not limited to: annual gynecological exams; screening for cervical and breast cancer; family planning counseling; contraceptive services; pregnancy testing and counseling regarding pregnancy options (including carrying to term and raising a child, placing the child for adoption, or abortion); abortions; miscarriage management; referrals for adoption; prenatal consultation; colposcopies; endometrial and vulvar biopsies; screening, diagnosis, and treatment of urinary, vaginal, and sexually transmitted infections; and HIV testing.

20.    PPWI provides first- and second-trimester abortion care, including (a) medication abortion, which is currently offered through 10 weeks from the first day of a woman's last menstrual period; and (b) aspiration abortion (a form of "surgical abortion" described in more detail below), which, depending on the provider at PPWI, is offered through 16 weeks from the first day of a woman's last menstrual period.

21.    PPWI does not have full-time physicians on staff.  Its abortion providers are physicians who work part time at PPWI.

22.    PPWI provides abortion care at three of its 21 locations: its Madison East clinic in Madison, Wisconsin ("Madison East"), its Milwaukee – Water Street health center in

Milwaukee, Wisconsin ("Water Street"), and its clinic in Sheboygan, Wisconsin.  The Madison
East and Water Street facilities offer medication and aspiration abortions 2–3 days per week, on
average.  The Sheboygan facility, which opened in May 2018, offers more limited abortion
services.  It provides medication abortions only and does so approximately 6 days per month,
offering a limited number of appointments on some of those days.  PPWI's ability to expand
abortion services to other facilities is significantly hampered by the need to find, and lack of,
Wisconsin physicians willing and available to provide abortion care.

      23.    Plaintiff KATHY KING, M.D., is a licensed physician and the medical director of
PPWI.  In this capacity, Dr. King provides a wide range of health care services to PPWI patients,
including medication and surgical abortions.  Dr. King is also responsible for developing PPWI's
protocol for medical services; overseeing the provision of medical care at all of PPWI's clinics,
including the services provided by advanced practice nurses; and determining when heath care
professionals at PPWI are qualified to perform specific procedures or provide specific
treatments.

      24.    Plaintiff NATALEE HARTWIG is PPWI's lead clinician for abortion services.
She is a certified nurse-midwife and an advanced practice nurse prescriber ("APNP"), which, as
discussed below, means that she is authorized by the Wisconsin Board of Nursing to prescribe
medications independently.  In her role as lead clinician for abortion services, Ms. Hartwig trains
physicians, nurses, and staff regarding PPWI's abortion-related protocols; provides training on
performing and interpreting ultrasounds; provides training on miscarriage management services;
and conducts audits to ensure that PPWI's medical staff abides by PPWI's protocols.  In
addition, she treats patients, including by providing medical care during follow-up visits after
medication abortions; treating post-abortion and early pregnancy complications; providing

miscarriage management; and performing intrauterine device ("IUD") insertions.  She also supervises other nurses in their provision of abortion-related care, such as administering sedation prior to an abortion and offering recovery room care following the procedure.

25.     Plaintiff SARA BERINGER is a certified nurse practitioner and an APNP at PPWI.  Ms. Beringer provides counseling about the different options—including abortion, adoption, or parenting—available to women, develops contraceptive plans with patients, and performs insertions and removals of long-acting contraceptives, such as implants and IUDs.  In addition, Ms. Beringer provides follow-up care to patients after medication abortions, including evaluation and management of potential complications, as needed.  She also provides sedation for, and monitors, patients during in-clinic surgical abortion procedures and is trained to provide advanced cardiovascular life support.

26.     Plaintiff KATHERINE MELDE is a certified nurse practitioner and an APNP at PPWI who provides family planning care for patients at all 21 of PPWI's facilities.  Before joining PPWI in 2018, Ms. Melde was employed as a nurse practitioner at the Planned Parenthood affiliate in the State of Washington, where she was permitted by law to provide medication abortions.  While working as a nurse practitioner for Planned Parenthood in Washington, Ms. Melde safely and independently performed medication abortions without direct physician supervision.  Despite her education, training, and experience, Ms. Melde is prohibited from providing abortion care in Wisconsin solely as a result of Wisconsin's **Physician-Only Restriction**.

## II.     DEFENDANTS

27.     Defendant JOSHUA KAUL is the Attorney General of the State of Wisconsin. As Attorney General, Mr. Kaul has the statutory authority to prosecute crimes, such as violations of the **Access Restrictions**, at the request of the Governor or the legislature, *see* Wis. Stat.

§ 165.25, or as a special prosecutor when requested by a district attorney, *see id.* § 978.045. Wis. Stat. § 165.50(1) also provides Mr. Kaul with independent authority to investigate crimes that are statewide in nature, importance, or influence. He is sued in his official capacity.

28.     Defendant ISMAEL OZANNE is the elected District Attorney for Dane County, Wisconsin. As District Attorney, Mr. Ozanne has the authority to prosecute violations of the **Access Restrictions** occurring in Dane County. *See id.* § 978.05(1). He is sued in his official capacity and as the representative of a class of the 71 elected district attorneys representing each of Wisconsin's counties, all of whom are sued in their official capacity. Because violations of the **Access Restrictions** or elements of such violations could occur in other Wisconsin counties, criminal charges alleging such a violation could be brought by district attorneys throughout the State. The class of defendant district attorneys is so numerous that joinder of all members of that class as defendants is impracticable. The named defendant will fairly and adequately protect the interests of the class. Certification of a class of district attorneys represented by Mr. Ozanne is, therefore, warranted.

29.     Defendant DAWN CRIM is the Secretary of the Wisconsin Department of Safety and Professional Services ("DSPS"). As such, she oversees the DSPS, which, among other things, is responsible for promulgating the rules of certain examining boards and credentialing boards, including the Medical Examining Board and Board of Nursing; for receiving, filing, and investigating complaints against a person who has been issued a professional credential; for commencing disciplinary proceedings; and for conducting hearings. *Id.* §§ 440.03, 440.04. She is sued in her official capacity.

30.     Defendants KENNETH B. SIMONS, TIMOTHY W. WESTLAKE, MARY JO CAPODICE, ALAA A. ABD-ELSAYED, DAVID A. BRYCE, MICHAEL CARTON,

PADMAJA DONIPARTHI, RODNEY A. ERICKSON, BRADLEY KUDICK, LEE ANN R. LAU, DAVID M. ROELKE, and ROBERT L. ZOELLER are members of the Medical Examining Board of Wisconsin.  As such, they are responsible for, among other things, establishing certain licensing requirements to practice medicine and surgery, granting licenses to practice medicine and surgery in the State of Wisconsin, investigating allegations of unprofessional conduct and negligence in treatment by Medical Examining Board licensees, conducting hearings on such alleged misconduct, and disciplining licensees who engage in misconduct. *Id.* §§ 448.02, 448.05(3).  Each of these individuals is sued in his or her official capacity.

31.     Defendants PETER J. KALLIO, PAMELA K. WHITE, LUANN SKARLUPKA, ROSEMARY DOLATOWSKI, JENNIFER EKLOF, ELIZABETH S. HOUSKAMP, SHERYL A. KRAUSE, and LILLIAN NOLAN are members of the Wisconsin Board of Nursing.  As such, they are responsible for, among other things, granting professional nursing licenses in the State of Wisconsin, investigating alleged violations of Wis. Stat. Ch. 441 or rules promulgated thereunder, conducting hearings on such alleged violations, and disciplining Board of Nursing licensees who violate applicable statutes or rules or engage in other forms of misconduct. *Id.* §§ 441.01, 441.06, 441.07.  Each of these individuals is sued in his or her official capacity.

## FACTS

## I.     EARLY ABORTION PRACTICE AND SAFETY

32.     Legal abortion is a common procedure and is one of the safest medical services provided to patients in the United States.

33.     Nationwide, roughly one out of every four women will have had an abortion by the time she reaches age 45.  Approximately 60 percent of women who receive an abortion already have at least one child, and most also plan to have children in the future—for many,

when they are older, financially able to provide for them, and/or in a supportive relationship with a partner so their children will have two parents.

34.     Legal abortions in the United States rarely result in serious complications.  Less than one quarter of one percent of all abortion patients experience a complication that requires hospitalization.

35.     The risk of complications from an abortion in the first trimester of pregnancy—when the overwhelming majority of abortions occur—is even lower.

36.     Abortion is markedly safer than carrying a pregnancy to term.  The risk of death associated with childbirth is approximately fourteen times higher than that associated with first-trimester abortion, and every pregnancy-related complication is more common among women having live births than among those having abortions.

37.     Four legal abortion methods are used in the United States today: medication abortion and three types of "surgical" abortion—aspiration, dilation and evacuation, and, rarely, induction.  All methods are extremely safe and effective.  In the first several months of pregnancy, abortions are typically performed using medication or aspiration.

38.     Medication abortion, which PPWI currently offers through the first 10 weeks of pregnancy, is typically performed using a regimen of two prescription drugs, mifepristone and misoprostol.  Mifepristone, also known by its commercial name Mifeprex, is taken first.  It temporarily blocks the hormone progesterone, which is necessary to maintain pregnancy, thereby causing the pregnancy tissue to detach from the uterine lining.  Mifepristone also increases the efficacy of the second medication in the regimen, misoprostol, by softening and opening the woman's cervix.  Misoprostol, which the woman generally takes 24–48 hours after the

mifepristone, causes the uterus to contract and expel the pregnancy tissue, thereby completing the abortion.

39.     Under current practice, a medical professional with prescribing authority dispenses the mifepristone to the woman at a health care facility, and she ingests the mifepristone onsite.  Twenty-four to 48 hours later, often when the woman is at home, the woman self-administers the misoprostol and passes the pregnancy tissue.

40.     Misoprostol is regularly used in like manner to evacuate retained pregnancy tissue when a woman has an involuntary miscarriage.

41.     Abortion by aspiration, which PPWI physicians offer during the first 14 to 16 weeks of pregnancy (depending on provider), is a minimally invasive and commonly used medical procedure that uses suctioning to remove pregnancy tissue.  It is identical to the aspiration procedure performed to remove retained pregnancy tissue after an involuntary miscarriage occurring at this early stage of pregnancy.  The aspiration abortion procedure typically takes between five and eight minutes to complete.

## II.     THE "PHYSICIAN-ONLY" RESTRICTION

42.     Wisconsin's **Physician-Only Restriction** unduly and, without sound medical basis, prohibits all advanced practice nurses from performing abortions, including medication and aspiration abortions.

43.     The **Physician-Only Restriction** is unjustified because it prohibits advanced practice nurses from performing those procedures even though they are highly qualified clinicians who, with training and experience, are capable of providing medication and aspiration abortions.

44.     Advanced practice nurses in Wisconsin already currently perform medical procedures that are similar to and more complex than aspiration or medication abortions.

45.     Peer-reviewed studies and leading medical and health authorities have also confirmed that properly trained advanced practice nurses can perform abortion procedures safely and effectively.

**A.    The Laws and Regulation Constituting Wisconsin's Physician-Only Restriction**

46.     Wisconsin law states that "[w]hoever intentionally performs an abortion and who is not a physician is guilty of a Class I felony." Wis. Stat. § 940.15(5).

47.     Wisconsin's Administrative Code similarly provides that "[t]he performance of abortions involves medical and surgical procedures . . . and may be performed only by physicians duly licensed by the medical examining board." Wis. Admin. Code Med. § 11.03.

48.     There are several other abortion-related statutes that necessitate or assume a physician will perform the abortion.

49.     One example is the Wisconsin law prohibiting abortions unless the woman has "given voluntary and informed written consent." Wis. Stat. § 253.10(3). The statute provides that, for a woman's consent to be informed, "at least 24 hours before the abortion is to be performed or induced, the physician who is to perform or induce the abortion or any other qualified physician has, in person, orally informed the woman" of certain abortion-related information, *id.* § 253.10(3)(c)(1), and the "physician who is to perform or induce the abortion, a qualified person assisting the physician or another qualified physician has, in person, orally informed the woman" of other information specifically delineated in the statute, *id.* § 253.10(3)(c)(2).

50.     Another example is Wis. Stat. § 940.04(1)–(2), which criminalizes the intentional destruction of an "unborn child" or "unborn quick child" or an act intended to destroy "an

unborn child" that "[c]auses the death of the mother."  That statute states that it does not apply to "a therapeutic abortion," but only if the abortion is "performed by a physician."  *Id.* § 940.04(5).

### B.   The Physician-Only Restriction is Medically Unjustified Given the Scope of Practice of Advanced Practice Nurses in Wisconsin

51.   "Advanced practice nurses" are a category of registered nurses who meet advanced education, training, examination, and licensing requirements, Wis. Admin. Code N. § 8.02 (1), and provide a broad range of care based on their education, training, and experience. They, along with other non-physician medical professionals with advanced experience and training (such as physician assistants), are also referred to as "advanced practice clinicians."

### Licensing Requirements

52.   A nurse's practice in Wisconsin is governed by both statute, *see* Wis. Stat. § 441.01, *et seq.*, and administrative rules promulgated by the Wisconsin Board of Nursing and the DSPS, *see id.* §§ 15.08, 440.03(1); Wis. Admin. Code Chs. N. 2, N. 4, N. 6–8.  The Board of Nursing is responsible for licensing all nurses, including advanced practice nurses.

53.   To qualify as an advanced practice nurse, a registered nurse must: (1) have a current license to practice as a professional nurse in Wisconsin; (2) currently be certified as a nurse practitioner, nurse-midwife, registered nurse anesthetist, or clinical nurse specialist by a national certifying body approved by the Board of Nursing; and (3) if the applicant received his or her national certification after July 1, 1998, also hold a master's or doctoral degree in nursing or a related health field granted by a college or university accredited by a regional accrediting agency approved by the Board of Education in the state in which the college or university is located.  Wis. Admin. Code N. § 8.02(1).

54.   For example, advanced practice nurses who are nurse practitioners are registered nurses who have received a master's degree or doctoral degree in nursing or a related health field

and who have been certified as nurse practitioners by a national certifying body approved by the Board of Nursing.  These nurses have undergone advanced clinical training beyond their registered nurse training.

55.    Advanced practice nurses who are nurse-midwives ("NMs") are registered nurses with advanced training in both nursing and midwifery.  To be licensed as a nurse-midwife, an individual must: (1) be a registered nurse authorized to practice as a professional nurse in Wisconsin; (2) complete an educational program in nurse-midwifery accredited by the American College of Nurse-Midwives, which typically includes extensive clinical hours working with women at all stages of pregnancy; and (3) hold a certificate issued by the American College of Nurse-Midwives or the American College of Nurse-Midwives Certification Council.  *Id.* § 4.03.

56.    Advanced practice nurses also have the option to obtain an additional, specialized certification from the Wisconsin Board of Nursing to be an APNP (advanced practice nurse prescriber).  APNPs must complete and provide proof of at least 45 contact hours in a continuing education program for clinical pharmacology/therapeutics and pass a jurisprudence examination. *Id.* § 8.03; Wis. Stat. § 441.16(2).

57.    After meeting those additional training and examination requirements and receiving a certificate from the Board of Nursing, APNPs may issue prescription orders independent from doctors.  Wis. Stat. § 441.16; Wis. Admin. Code N. §§ 8.02(2), 8.03, 8.06(1).

58.    To maintain this certification to issue prescription orders, an APNP must, every two years, complete 16 contact hours of continuing education in clinical pharmacology or therapeutics relevant to the APNP's area of practice, including at least two contact hours in the responsible prescription of controlled substances.  Wis. Admin. Code. N. § 8.05(1).

## Scope of Practice Rules for Advanced Practice Nurses

59.     Advanced practice nurses are authorized by Wisconsin law and the Board of Nursing's scope of practice rules to perform "any act in the observation or care for the ill, injured, or infirm, or for the maintenance of health or prevention of illness of others, that requires substantial nursing skill, knowledge, or training, or application of nursing principles based on biological, physical, and social sciences."  Wis. Stat. §§ 441.001(4), 441.06(2); Wis. Admin. Code N. §§ 6.03, 8.02.  Neither the Wisconsin legislature nor the Board of Nursing specifically enumerates which procedures an advanced practice nurse may perform.

60.     NMs, a specialized type of advanced practice nurse, have a broad scope of practice that includes "the overall management of women's health care, pregnancy, childbirth, postpartum care for newborns, family planning, and gynecological services."  Wis. Admin. Code N. § 4.06(1).  A NM is empowered to "manage that part of the care of the patient which is appropriate to the knowledge and skills of the nurse-midwife," *id.* § 4.06(4), which (as described below) often includes managing and providing care that is as complex, if not more complex, than early-term abortion care.

61.     A NM's scope of practice often includes, but is not limited to, advanced physical assessment of patients; selection and performance of diagnostic and therapeutic procedures; order and interpretation of laboratory tests; diagnosis, treatment, and ongoing monitoring of common acute and chronic clinical conditions; prescription of treatments and therapies; and patient case management and referral to physicians and other specialists—all without on-site physician supervision.

62.     In accordance with the Board of Nursing's practice rules, NMs collaborate with a physician who has post-graduate training in obstetrics, pursuant to a written agreement with that

15

physician.  *Id.* § 4.06(2).  When a complication or emergency arises, NMs consult with the physician or "refer the patient [to the doctor] pursuant to the written agreement."  *Id.* § 4.06(3).

63.     Nurse practitioners, another type of advanced practice nurse, similarly have a broad scope of practice.  A nurse practitioner's scope of practice includes diagnosing and treating patients with acute and chronic illnesses and diseases, taking comprehensive health histories, providing physical examinations and other health assessments, ordering and interpreting laboratory tests, and providing health education and counseling.

64.     Under the Board of Nursing's practice rules, advanced practice nurses (such as NMs or nurse practitioners) who are certified by the Nursing Board as APNPs have extremely broad authority to issue prescription orders independently, as appropriate to the APNP's "areas of competence, as established by his or her education, training or experience."  *Id.* § 8.06.

65.     The Board of Nursing's practice rules further allow APNPs to dispense drugs to a patient at the treatment facility at which the patient is treated.  *Id.* § 8.09.

66.     The only limitations on an APNP's prescribing and dispensing authority are that the APNP cannot: (1) prescribe schedule I drugs; (2) prescribe, dispense, or administer certain drugs or compounds designated as a schedule II controlled substance, except for treatment of certain, specified conditions; or (3) prescribe, order, dispense, or administer any anabolic steroids for the purpose of enhancing athletic performance or for other nonmedical purpose.  *Id.* § 8.06. The Board of Nursing's practice rules do not prohibit APNPs from issuing prescription orders for mifepristone and misoprostol.  *See id.*

**Advanced Practice Nurses in Action in Wisconsin and at PPWI**

67.     Advanced practice nurses provide patient care at each of PPWI's 21 health centers around the State of Wisconsin.  Approximately 90 percent of PPWI's advanced practice nurses are also certified by the Board of Nursing as APNPs.

16

68.     Consistent with the Board of Nursing's scope of practice guidelines, advanced practice nurses in Wisconsin, including the advanced practice nurses at PPWI, provide a vast array of critical health care services to patients in the State.

69.     These include a number of services related to gynecological, pregnancy, childbirth, and post-partum care.  For example, all PPWI advanced practice nurses provide general reproductive health care services to Wisconsin women, including providing pregnancy options counseling and developing contraceptive plans.  Several of PPWI's advanced practice nurses, including Plaintiffs Hartwig and Beringer, specialize in providing abortion services and miscarriage management and regularly provide all legally allowed elements of patient care before and after an abortion.  For instance, Plaintiffs Hartwig and Beringer diagnose and date the pregnancy (typically by ultrasound) when a patient is seeking an abortion (the same procedure used when a patient is seeking ongoing care for her pregnancy) and evaluate and manage patient care following an abortion.

70.     Advanced practice nurses in Wisconsin, including the advanced practice nurses at PPWI, perform a large number of procedures and issue prescriptions in connection with gynecological services, pregnancy, childbirth, and post-partum care that are as complex as, or more complex than, medication or aspiration abortion care.

71.     For example, advanced practice nurses in Wisconsin, including Plaintiff Hartwig, perform endometrial biopsies by inserting a sterile tube through a patient's vaginal canal and cervix into the uterus to suction tissue from the uterine lining for biopsy.  In addition, advanced practice nurses in Wisconsin, including PPWI advanced practice nurses, perform colposcopies (inserting instruments into the vaginal canal to magnify the cervix and, when appropriate, removing tissue for biopsy).  Advanced practice nurses in Wisconsin, including PPWI advanced

17

practice nurses, also insert paracervical blocks, a procedure in which a local anesthetic is injected into sites alongside the vaginal portion of the cervix to relieve pain caused by contractions or stretching of the cervix.  Each of these procedures is at least as complex as aspiration abortion care and more complex than medication abortion.

72.     Wisconsin NMs are permitted to, and do, induce labor (sometimes using cervical dilators); prescribe epidural anesthesia; deliver a child and placenta; perform episiotomies (a surgical incision to enlarge the vaginal opening to help deliver a baby); and repair obstetrical lacerations—procedures more complex than aspiration and medication abortion care.  NMs at PPWI, including Plaintiff Hartwig, have experience performing these procedures, generally from their employment outside of PPWI.  Ms. Hartwig has delivered between 200 and 300 babies in her career, and has treated several cases of hemorrhaging following childbirth.

73.     Most significantly in relation to the ability and competence of advanced practice nurses to safely provide aspiration abortions, if a patient has retained tissue in her uterus following a miscarriage or an abortion, PPWI advanced practice nurses perform aspirations to evacuate the uterus to reduce risk of infection and other complications—a procedure identical to an aspiration abortion.  In fact, aspiration conducted following a miscarriage can involve greater risk of complications and bleeding than the controlled context of an aspiration abortion.  Because of the **Physician-Only Restriction**, however, advanced practice nurses—including Plaintiffs Hartwig and Beringer—are prohibited from performing the same procedure for purposes of an aspiration abortion.

74.     The existing scope of practice of Wisconsin advanced practice nurses, as well as consistent study results and guidance from prominent medical and public health authorities,

18

confirm that there is no rational medical basis for categorically barring advanced practice nurses from performing medication and aspiration abortions.

75.     In particular, there is no medical justification for prohibiting advanced practice nurses in Wisconsin from performing aspiration abortions when they are already allowed to perform the same procedure in the context of a miscarriage, which can involve greater risks to the patient.

76.     But for the **Physician-Only Restriction**, Plaintiff Hartwig could, based on her training and experience, promptly provide aspiration abortion services and other advanced practice nurses at PPWI, including Plaintiffs Beringer and Melde, would immediately pursue training to expand their scope of practice to encompass aspiration abortion services.

77.     As a general matter, APNPs in Wisconsin also prescribe medications for procedures that carry a much higher level of risk than does medication abortion.

78.     Given their existing authority to prescribe medication independently, APNPs, including PPWI APNPs, such as Plaintiffs Hartwig, Beringer, and Melde, are already authorized to, and do, prescribe misoprostol outside the medication abortion context.  For instance, they prescribe misoprostol to prepare a patient's cervix for IUD insertion.  When a patient has a miscarriage or has retained tissue in her uterus following an abortion, APNPs in Wisconsin, including PPWI APNPs, also prescribe misoprostol to evacuate the uterus to reduce risk of infection and other complications.

79.     There is no medical justification for prohibiting advanced practice nurses from prescribing medication that they are otherwise authorized (based on their training, education, and certification) to provide safely and effectively, simply because it is used to induce a medication abortion, a procedure that carries less of a risk of bleeding and that requires less skill than

miscarriage management.  Certainly, there is no medical justification for prohibiting advanced

practice nurses from prescribing medication to induce a medication abortion when APNPs in

Wisconsin are generally permitted to prescribe medications in the context of far riskier medical

procedures.

80.     But for Wisconsin's **Physician-Only Restriction**, Plaintiffs Hartwig, Beringer,

Melde, and one other APNP at PPWI could, given their training and experience, promptly begin

providing medication abortions, and many other APNPs at PPWI could begin performing

medication abortions after receiving training.

      **C.**     **Studies Establish That Advanced Practice Nurses Can Provide Safe, Effective Abortion Care**

81.     Numerous peer-reviewed studies confirm that statutes like Wisconsin's

**Physician-Only Restriction** place an unjustified restriction on abortion care by prohibiting

advanced practice nurses from performing abortion procedures.  These peer-reviewed studies

uniformly confirm that advanced practice nurses and other advanced practice clinicians can

provide medication and aspiration abortions as competently as physicians.

82.     In several states across the country (such as California, Vermont, and New

Hampshire), advanced practice clinicians, including certified nurse practitioners, certified nurse-

midwives, and physician assistants, are already legally permitted to provide both aspiration and

medication abortion care, and in a number of additional states they are permitted to provide

medication abortions.

83.     In a recent comprehensive survey of studies on abortion care in the United States

titled, "*The Safety and Quality of Abortion Care in the United States*," the National Academies

of Sciences, Engineering, and Medicine (the "National Academies")—nonprofit, nonpartisan

institutions that serve as independent advisors to the government on matters pertaining to

science, engineering, and medicine—found existing peer-reviewed research to conclude overwhelmingly that advanced practice nurses can safely and effectively provide both aspiration and medication abortions.[1]

84.     One 2013 study discussed in the National Academies survey, for example, evaluated patient outcomes for 5,812 aspiration abortions performed by physicians and 5,675 aspiration abortions performed by advanced practice nurses and physician assistants.[2] Researchers found that complications were rare among both groups and that the "complications were clinically equivalent between newly trained [nurse practitioners, nurse-midwives, and physician assistants] and physicians."[3]

85.     Studies focused on medication abortion have similarly found that advanced practice nurses provide medication abortion services as safely as, and perhaps more effectively than, physicians.[4]  For example, a 2014 study on the safety and efficacy of medication abortion provided by nurse-midwives as compared to physicians "showed the superior efficacy of nurse-

---

[1] National Academies of Sciences, Engineering, & Medicine, *The Safety and Quality of Abortion Care in the United States* 103-05, 118-19 (2018) (hereinafter "National Academies Study").

[2] National Academies Study at 103; *see* Tracy A. Weitz, et al., *Safety of Aspiration Abortion Performed by Nurse Practitioners, Certified Nurse Midwives, and Physician Assistants Under a California Legal Waiver*, 103(3) Am. J. Pub. Health 454 (2013), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3673521/.

[3] *See* Weitz, et al; *see also* Eva Patil et al., *Aspiration Abortion with Immediate Intrauterine Device Insertion: Comparing Outcomes of Advanced Practice Clinicians and Physicians*, 61 J. of Midwifery & Women's Health 325 (2016) (finding no difference in complication rates between aspiration abortions performed by advanced practice clinicians and physicians in state of Oregon); Shireen J. Jejeebhoy et al., *Can Nurses Perform Manual Vacuum Aspiration (MVA) as Safely and Effectively as Physicians? Evidence from India*, 84 Contraception 615, 620 (2011) (finding that aspiration abortion "can be provided with equal safety and effectiveness . . . by nurses as by physicians").

[4] *See* Shireen J. Jejeebhoy et al., *Feasibility of Expanding the Medication Abortion Provider Base in India to Include Ayurvedic Physicians and Nurses*, 38 Int'l Perspectives on Sexual & Reprod. Health 133, 139 (2012); Claudia Diaz Olavarrieta et al., *Nurse Versus Physician-Provision of Early Medical Abortion in Mexico: A Randomized Controlled Non-Inferiority Trial*, 93 Bulletin of the World Health Organization 249 (2015); I.K. Warriner et al., *Can Midlevel Health-Care Providers Administer Early Medical Abortion As Safely and Effectively As Doctors?*, 377 Lancet 1155, 1159–60 (2011).

midwife provision of early medical [termination of pregnancy] in healthy women, when compared with standard doctor provision."[5]

### D. Leading Medical and Public Health Authorities Support the Provision of Abortion Care by Advanced Practice Nurses

86.    Consistent with the overwhelming consensus of this research, a significant number of leading medical authorities and professional associations support the provision of abortion services by advanced practice clinicians, such as advanced practice nurses.

87.    Based on their review of the scientific evidence regarding the safety and quality of abortion care provided by advanced practice clinicians, the National Academies concluded that state laws and regulations prohibiting advanced practice clinicians from providing abortion care—such as Wisconsin's **Physician-Only Restriction**— establish "higher-level credentials than are necessary based on the clinical competencies" of advanced practice clinicians, because advanced practice clinicians (such as advanced practice nurses) "can provide medication and aspiration abortions safely and effectively."[6]  This has the effect of "reduc[ing] the availability of providers, resulting in inequitable access to abortion care based on a woman's geography."[7]  The National Academies further concluded that these restrictions "limit patients' preferences, as patient choice is contingent on the availability of trained and experienced providers[,] . . . impacts patient-centered care, and also negatively affects the efficiency of abortion services by potentially increasing the costs of abortion care as the result of requiring the involvement of a

---

[5] H. Kopp Kallner et al., *The Efficacy, Safety and Acceptability of Medical Termination of Pregnancy Provided By Standard Care by Doctors or By Nurse-Midwives: A Randomized Controlled Equivalence Trial*, 122 Brit. J. Obstetrics & Gynecology 510, 515 (2014).

[6] National Academies Study at 117-19.

[7] *Id.* at 118.

physician to perform a procedure that can be provided safely and effectively by an [advanced practice clinician]."[8]

88.   The American College of Obstetricians and Gynecologists ("ACOG"), a nonprofit, non-partisan professional organization of medical care professionals with more than 58,000 members dedicated to the improvement of women's health, expressly opposes restrictions like the **Physician-Only Restriction** that limit abortion services to physicians only.  Citing several studies, ACOG has found that they "show no difference in outcomes in first-trimester medical and aspiration abortion by provider type and indicate that trained [advanced practice clinicians] can provide abortion services safely."[9]

89.   The American Public Health Association ("APHA")—the nation's leading nonprofit, nonpartisan public health organization—similarly recognizes that physician-only requirements are outdated and expressly recommends that advanced practice nurses be permitted to provide both aspiration and medication abortion care.[10]

90.   The World Health Organization (the "WHO") has likewise confirmed that medication and aspiration abortion can be safely provided by advanced practice nurses.  The WHO explained that health care providers, including advanced practice nurses, "can be trained

---

[8] *Id.*

[9] ACOG, *Committee Opinion on Health Care for Underserved Women*, No. 612 (Nov. 2014, reaffirmed 2017), https://www.acog.org/Clinical-Guidance-and-Publications/Committee-Opinions/Committee-on-Health-Care-for-Underserved-Women/Abortion-Training-and-Education?IsMobileSet=false.

[10] APHA, *Provision of Abortion Care by Advanced Practice Nurses and Physician Assistants* (Nov. 2011), https://www.apha.org/policies-and-advocacy/public-health-policy-statements/policy-database/2014/07/28/16/00/provision-of-abortion-care-by-advanced-practice-nurses-and-physician-assistants.

to perform vacuum aspiration" and that "midlevel health-care providers can also administer and supervise abortion services."[11]

91.     Finally, the U.S. Food and Drug Administration (the "FDA") recognizes that qualified health care providers, including advanced practice nurses, acting within their scope of practice may dispense the drugs necessary for a medication abortion, if allowed under state law. The FDA has concluded that published research establishes that "healthcare providers other than physicians can effectively and safely provide abortion services."[12]

92.     As such, academics, medical professional membership organizations, and governmental organizations across a wide spectrum agree that advanced practice clinicians, such as advanced practice nurses, are capable of providing medication and aspiration abortion care just as safely and effectively as doctors.

## III.     THE "SAME-PHYSICIAN" RESTRICTION

93.     Wisconsin's **Same-Physician Restriction** unduly and, without medical basis, requires that, when a woman receives a medication abortion, the physician who prescribes the abortion-inducing drug must also perform a pre-abortion physical examination of the woman.

94.     The **Same-Physician Restriction** is unjustified because there is no legitimate medical reason to preclude a physician from relying on a physical examination conducted by another qualified medical professional when prescribing a medication or performing a procedure. As further discussed below, the **Same-Physician Restriction** has no analog outside the medication abortion context.  For example, there is no requirement that the same medical

---

[11] WHO, *Safe Abortion: Technical and Policy Guidance for Health Systems* 67 (2nd ed. 2012), http://apps.who.int/iris/bitstream/handle/10665/70914/9789241548434_eng.pdf;jsessionid=D104BE60851EEB0BA C963FAE9B79CCAF?sequence=1.

[12] FDA Ctr. for Drug Evaluation & Res., Summary Review of Application No. 020687Orig1s020, 17 (Mar. 29, 2016), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020SumR.pdf.

professional who performs a surgical abortion must also conduct the preliminary physical examination of the woman.

### A.     The Laws Constituting Wisconsin's Same-Physician Restriction

95.     Wisconsin statutes require medical professionals to provide specified information to a woman seeking an abortion at least 24 hours before the abortion is induced or performed. Wis. Stat. § 253.10(3)(a), (c)(1).

96.     Wisconsin's statutory scheme further provides that "[n]o person may give an abortion-inducing drug to a woman unless the physician who prescribed, or otherwise provided the abortion-inducing drug for the woman," is the one to "[p]erform[] a physical examination of the woman before" she receives the specified pre-abortion information.  *Id.* § 253.105(2)(a). Because the woman must receive that information at least 24 hours before the abortion is induced, *id.* § 253.10(3)(c)(1), the physical examination must also occur at least 24 hours before the abortion is induced, and must be conducted by the same physician who ultimately prescribes the abortion-inducing medication.

### B.     The Scope of Practice of Physicians in Wisconsin

97.     Physicians' practice of medicine and surgery in Wisconsin is governed by both statute, *see id.* § 448.01, *et seq.*, and by rules promulgated by the Medical Examining Board, *see id.* § 15.08(5)(b); Wis. Admin. Code Med. § 1.01, *et seq.*

98.     Wisconsin law gives licensed physicians expansive authority "[t]o examine into the fact, condition or cause of human health or disease, or to treat, operate, prescribe or advise for the same, by any means or instrumentality" and "[t]o apply principles or techniques of medical sciences in the diagnosis or prevention of any of the[se] conditions."  Wis. Stat. § 448.01.  The legislature does not define precisely how and under what circumstances physicians may carry out their medical practice.

25

99.     The Medical Examining Board's rules also provide only general guidance regarding a physician's activities.

100.    It is standard, accepted, and ethical practice for a physician to perform a procedure or prescribe drugs for a patient whose preliminary "work-up" for the treatment, including the provision of information about the risks of the medical treatment and a preliminary physical examination, has been done by a qualified medical professional other than the physician who will ultimately perform the procedure or prescribe the drug.

101.    It is also common practice for physicians (including those in obstetrics and gynecology) to work in group practices, in which the responsibilities for patients' care are shared among different physicians according to a coverage schedule.

102.    Similarly, it is common practice for one medical professional, such as an advanced practice nurse, to provide counseling for different course-of-treatment options and obtain consent for a procedure on one day, and a different medical professional to perform the procedure on a different day.

**C.     There is No Medical Need for the Prescribing Physician to Be the One to Perform a Pre-Abortion Physical Examination**

103.    The **Same-Physician Restriction** interferes with the common, accepted, and ethical practices of physicians in Wisconsin.

104.    Neither Wisconsin statute nor the Wisconsin Administrative Code requires the same physician to perform both the physical examination and prescribe drugs or provide follow-up treatment in any context other than a medication abortion.

105.    Patients often are physically examined by one medical professional and then issued medications by a different medical professional in situations where the medication produces an even more significant physiological result than the expulsion of pregnancy tissue.

26

For example, it is common for a gynecologist or oncologist to examine a patient and diagnose her with ovarian cancer, and then for another medical professional (including an APNP) to prescribe and administer chemotherapy treatment.  Indeed, in a hospital setting, including in intensive care units where critically ill patients are in life and death situations, different teams of medical professionals routinely care for patients during different shifts, with one medical professional examining the patient during one shift and another medical professional prescribing medication based on the results of that examination noted in the patient's medical records.

106.    For that matter, the Wisconsin legislature has only selectively applied the **Same-Physician Restriction** in the abortion context.  It applies only to medication abortions.  When a woman receives a surgical abortion, there is no similar requirement that the physician performing the abortion must also be the one to physically examine the woman prior to the procedure.  One physician or advanced practice clinician may physically examine the patient prior to the abortion and a different physician altogether may perform the surgical abortion.

107.    The Wisconsin legislature's decision to impose the **Same-Physician Restriction** solely with respect to medication abortions demonstrates that it is untethered to the medical needs of the patient and serves no legitimate medical purpose.

## IV.    THE "PHYSICAL-PRESENCE" RESTRICTION

108.    Wisconsin's **Physical-Presence Restriction** unduly, and without sound medical basis, requires the physician who prescribed an abortion-inducing drug to be physically present in the room when the woman is "given" the abortion-inducing drug.

109.    The **Physical-Presence Restriction** is medically unjustified because an abortion-inducing drug can be safely and effectively administered without a physician or other prescribing professional physically present.

27

110.     The lack of any medical justification for the **Physical-Presence Restriction** is also clear from the fact that Wisconsin requires a physician's physical presence only when a woman is "given" mifepristone, which does not present a risk of immediate adverse reaction. Wisconsin does not require a physician to be physically present when a patient is administered any other drug, even drugs that can cause an immediate adverse reaction.

**A.     The Law Constituting Wisconsin's Physical-Presence Restriction**

111.     The Wisconsin statute that requires a single physician to both conduct the patient's pre-abortion physical exam and prescribe the "abortion-inducing drug" also requires that this same physician be "physically present in the room when the drug is given to the woman." Wis. Stat. § 253.105(2)(b).

**B.     There is No Medical Need for the Prescribing Physician to be Physically Present in the Room When a Woman is Given Drugs for Medication Abortion Care**

112.     Neither Wisconsin statute nor the Wisconsin Administrative Code singles out *any* other medication that can be given to a patient only when the prescribing physician and patient are physically in the same place.

113.     The **Physical-Presence Restriction** represents a stark departure from the manner in which drugs are administered or dispensed to patients in every other context.  In situations involving the prescription of medication to a patient, the person who administers the drug to a patient is not typically a physician.  In a typical situation, a medical professional with prescribing authority will issue a prescription to a patient and either a nurse will administer the medication or the patient will obtain the medication from a nurse or a pharmacy and self-administer the drug. In both instances, the prescriber often is not present when the drug is administered or dispensed, and is *never* required by law to be present when the drug is administered or dispensed.

114.     Indeed, under Wisconsin statutes and administrative rules, prescribing physicians need not be present when their patients are administered drugs that pose a higher risk of side effects and/or present a risk of more serious side effects than the drugs used for a medication abortion.  Chemotherapy drugs or opioids, for example, can be administered by a nurse without a doctor present in the room.

115.     The fact that Wisconsin permits patients to receive all drugs without the prescribing physician being physically present except when the medication is provided for medication abortion shows that there is no medical justification for the **Physical-Presence Restriction**.

116.     Further underscoring the lack of any credible medical justification for the **Physical-Presence Restriction**, Wisconsin does not require a physician and patient to be in the same room when the very same drugs used for a medication abortion are given to a patient to treat another medical condition.  For example, a physician who prescribes misoprostol is permitted under Wisconsin law to remain offsite when that drug is dispensed to a woman to induce the expulsion of pregnancy tissue following a miscarriage.

117.     There is no procedure, aside from a medication abortion, where a Wisconsin statute or the Wisconsin Administrative Code requires a particular physician merely to be *present* in the room during the provision of a drug or other treatment, regardless of whether the physician actually plays any role in the patient's treatment.

118.     This singular application of such a physical-presence requirement in the medication abortion context reinforces that it is designed as an impediment to abortion access, not a medically justifiable rule to promote a patient's well-being.

**C. The Physical-Presence Restriction is Also Medically Unnecessary Because a Clinician Can Supervise a Medication Abortion Using Telemedicine**

119.    Additionally, even if it were reasonable to require the same clinician who prescribed the medication abortion drugs—under Wisconsin's **Physician-Only Restriction**, currently just physicians—to physically oversee the woman being given the medication, the **Physical-Presence Restriction** is unduly restrictive because it precludes offsite clinicians from supervising the provision of medication abortion drugs using videoconferencing and/or web-based communication tools, a commonly used form of patient care known as "telemedicine."

120.    Using telemedicine, an offsite physician or APNP can safely and effectively oversee and provide medication abortion care in a manner that is virtually identical to the supervision and care that physicians currently provide when a patient receives a medication abortion.

121.    Given advances in telecommunication technology and in the secure electronic storage and transmission of patient information, health care professionals increasingly use videoconferencing and web-based communication tools to provide safe and effective medical care to patients located at a different facility.

122.    Telemedicine, where appropriate, is as safe and effective as in-person medical treatment. Studies have consistently shown that the quality of health care services delivered via telemedicine are as good as those provided by onsite professionals.[13]

123.    A systematic review of telemedicine studies in 2015, for example, found no difference in mortality between heart failure patients who received care via telemedicine and those who received onsite care. It also found no difference in the effectiveness of in-person

---

[13] American Telemedicine Association, Telemedicine Benefits, http://www.americantelemed.org/main/about/about-telemedicine/telemedicine-benefits.

therapy and therapy provided via telemedicine to patients with mental health and substance abuse problems.[14]

124.    The use of telemedicine also has a number of salutary benefits.  It expands patient access to health care, particularly in rural communities far from full-service medical centers. Telemedicine also removes a host of obstacles for patients associated with medical-based travel, such as transportation expenses, lost time from work, and child care costs.[15]  Telemedicine can help minimize costs and increase efficiency for the health care industry, as well, by promoting shared staffing among clinics and institutions, reducing costs associated with staff travel, and enabling fewer or shorter patient hospital stays.[16]

125.    The **Physical-Presence Restriction** unjustifiably prohibits prescribing clinicians from using telemedicine to provide medication abortion care, given that (a) Wisconsin medical professionals routinely use telemedicine to treat conditions that are more severe and require more complex and in-depth assessment and medical intervention than medication abortions; (b) clinicians in numerous other states use telemedicine to provide medication abortion care; (c) peer-reviewed studies and leading medical and health authorities have confirmed that clinicians can use telemedicine to safely and effectively provide medication abortion; (d) APNPs at PPWI already offer a variety of medical services by telemedicine, including prescribing medications that are similar in risk level to the drugs required for medication abortion; and

---

[14] Gerd Flodgren, et al., *Interactive Telemedicine: Effects on Professional Practice and Health Care Outcomes*, Cochrane Database of Systematic Reviews 2015, Issue 9, Art, No. CD002098, http://cochranelibrary-wiley.com/doi/10.1002/14651858.CD002098.pub2/full.

[15] Medical University of South Carolina, Maternal Fetal Medicine, https://muschealth.org/medical-services/womens/maternal-fetal-medicine; U.S. Department of Veterans Affairs, VA Telehealth Services: Real-Time Clinic Based Video Telehealth,  https://www.telehealth.va.gov/real-time/index.asp.

[16] American Telemedicine Association, Telemedicine Benefits, http://www.americantelemed.org/main/about/about-telemedicine/telemedicine-benefits.

(e) physicians and APNPs could provide medication abortion care in a process using telemedicine that is virtually identical to how medication abortion care is provided now by onsite staff.

## Wisconsin Generally Permits the Use of Telemedicine

126.    The rules promulgated by the Medical Examining Board expressly permit physicians to provide health care services via "telemedicine."  Wis. Admin. Code Med. §§ 24.03-24.07.

127.    Guidance from the Wisconsin Department of Health Services also reflects that advanced practice clinicians, such as advanced practice nurses, may provide services via telemedicine.[17]

128.    Under the Medical Examining Board rules, "telemedicine" broadly encompasses "the practice of medicine when patient care, treatment, or services are provided through the use of medical information exchanged from one site to another via electronic communications." Wis. Admin. Code Med. § 24.02.

129.    The Wisconsin Administrative Code neither specifies what type of care a physician may provide using telemedicine nor prohibits a physician from performing any particular procedure via telemedicine.

130.    The Wisconsin Administrative Code permits physicians to issue prescriptions via telemedicine, so long as (a) the physician is licensed to practice medicine and surgery; (b) the physician's name and contact information have been made available to the patient; (c) the patient has given informed consent for the treatment; (d) a documented patient evaluation has been performed; and (e) a patient health care record has been prepared and maintained.  *Id.* § 24.07(1).

---

[17] Dep't of Health Servs., *ForwardHealth: Wisconsin Serving You*, Aug. 2017, at 1, https://www.forwardhealth.wi.gov/kw/pdf/2017-25.pdf.

131.     The Medical Examining Board holds the physician to the same standards of practice and conduct, including patient confidentiality and record keeping, regardless of whether the health care services are provided in person or via telemedicine.  *Id.* § 24.05.  Further, the physician is responsible for ensuring the quality and safe use of the telemedicine equipment and technology that is integral to patient diagnosis and treatment.  *Id.* § 24.06.

### Wisconsin Medical Professionals Routinely Use Telemedicine to Treat Patients

132.     Medical professionals in Wisconsin and other states currently utilize telemedicine to evaluate, treat, and provide care to patients for a wide variety of medical issues.  Many of the conditions treated using telemedicine are more severe and require more complex and in-depth assessments and medical intervention than the provision of the drugs necessary to induce and complete a medication abortion.

133.     For example, Wisconsin medical professionals use telemedicine in the areas of gynecology, emergency medicine, intensive care treatment, pediatrics, and dermatology. Wisconsin physicians routinely prescribe medications via telemedicine.

134.     Wisconsin hospitals and clinics utilize telemedicine to reach the state's rural communities and provide an array of medical services, including the prescription of medications. For example, medical facilities in Wisconsin use telemedicine equipment to offer specialist assistance during newborn resuscitation and the treatment of renal disease.[18]  One of the State's leading hospitals has implemented a telemedicine program to enable its neurologists to assist

---

[18] *Teleneonatology*, Mayo Clinic Health System: Eau Claire, https://mayoclinichealthsystem.org/locations/eau-claire/services-and-treatments/birthing-centers/teleneonatology (describing teleneonatology program enabling neonatal specialists in Rochester to provide assistance during newborn resuscitation); Candi Heselth, *Marshfield Telehealth Program Reaches Rural Kidney Patients in Northern Wisconsin,* The Rural Monitor (Feb. 14, 2012), https://www.ruralhealthinfo.org/rural-monitor/marshfield-telehealth-program/ (discussing telehealth program connecting nephrologists with renal disease patients in rural areas of Wisconsin).

rural medical clinicians in the diagnosis of strokes.[19]  As part of this assistance, the remote neurologists evaluate whether a "clot buster" drug, tPA, is appropriate for the patient.[20]

135.    In some western Wisconsin hospitals, telemedicine has been used to increase the availability of hospitalists to provide non-emergency care after hours.  A hospitalist is available via video link to initiate care plans and order prescriptions.[21]

### In Several States, Health Care Professionals Already Provide Medication Abortions Using Telemedicine

136.    Medication abortion is currently provided via telemedicine in a number of states, including Alaska, Hawaii, Idaho, Illinois, Iowa, Maine, Maryland, New York, Oregon, Virginia, and Washington.

137.    Health care professionals within these states generally incorporate telemedicine into the medication abortion process as follows: A staff member at a health care facility where the patient is located obtains the patient's medical history, conducts any necessary lab work, and performs an ultrasound.  A clinician at a different location then reviews the patient's record using secure web-based tools and meets with the patient via a secure video conference or web-based connection.  If the offsite clinician believes the patient is eligible for the medication abortion, the clinician will give the patient instructions on the medication abortion process and prescribe mifepristone and misoprostol to the patient, which are provided to the patient by onsite staff.

---

[19] *See UW Health Telehealth: University of Wisconsin Telestroke Network*, UW Health, https://www.uwhealth.org/telehealth/university-of-wisconsin-telestroke-network/20572.

[20] See David Wahlberg, *Technology Can Aid Health Issues in Rural Areas, Wisconsin State Journal*, (Dec. 26, 2010) http://host.madison.com/wsj/special-section/rural_health/technology-can-aid-health-issues-in-rural-areas/article_ed68add8-0de8-11e0-a644-001cc4c002e0.html.

[21] *See* Hudson Hospital & Clinic, *New Telemedicine Program Will Improve Access to Western Wisconsin Hospitals* (Sept. 11, 2017), http://www.hudsonhospital.org/news/new-telemedicine-program-will-improve-access-to-western-wisconsin-hospitals/.

138.    Except for the location of the prescribing clinician, this process is functionally the same as medication abortion by an in-person clinician, such as is currently practiced at PPWI.

### Studies Consistently Establish that Telemedicine Can Be Used to Provide Safe and Effective Medication Abortions

139.    Studies show that telemedicine can be safely and effectively used in the provision of medication abortions.

140.    The National Academies, in their recent survey of studies on the safety and quality of abortion care in the United States, concluded that "[t]here is no evidence that the dispensing or taking of mifepristone tablets requires the physical presence of a clinician . . . to ensure safety or quality.  The effects of mifepristone occur after women leave the clinic, and extensive research shows that serious complications are rare.  The risks of medication abortion are similar in magnitude to the risks of taking commonly prescribed and over-the-counter medications such as antibiotics and NSAIDs."[22]  The study further found that there is no evidence to suggest that state laws, like Wisconsin's, requiring a clinician to be physically present to provide the medication (thus prohibiting the use of telemedicine to prescribe the medication remotely) improve safety or quality.[23]

141.    Another study, published in 2017 in the journal *Obstetrics and Gynecology*, found that women who were provided a medication abortion via telemedicine were statistically no more likely to experience adverse events from the procedure than women who were prescribed the abortion-inducing medication in person.  The study included 20,000 patients at Planned Parenthood in Iowa who were prescribed mifepristone for a medication abortion either via telemedicine or by an in-person clinician.

---

[22] National Academies Study at 79.
[23] *Id.*

142.    The study found that adverse events from medication abortions are exceedingly rare.  Even so, women who were provided a medication abortion via telemedicine were statistically *less* likely to experience adverse events from the procedure than women who were prescribed the abortion medication in person.  The study concluded that 0.18 percent of telemedicine patients had a clinically significant adverse event, compared to 0.32 percent of in-person patients.[24]

143.    Importantly, the study also noted that "[i]n the 2 years after telemedicine was introduced at Planned Parenthood of the Heartland clinics, women had an almost 50% higher adjusted odds of obtaining a first-trimester abortion instead of second-trimester abortion compared with the 2 years before telemedicine."  That is, over the two years telemedicine services were first made available, a woman was 50 percent more likely to have a first-trimester abortion than a second-trimester abortion.[25]

144.    Second-trimester abortions, which rarely result in serious complications, are nevertheless associated with a higher risk of complications than first-trimester abortions.

145.    Another study focusing on Planned Parenthood clinics in Alaska found that telemedicine also allows for a more "patient-centered approach to care."  The study determined that, given the option of telemedicine, "women were able to be seen sooner, with greater choice in abortion procedure type, and closer to their home."[26]

---

[24] Daniel Grossman, M.D. and Kate Grindlay, MSPH, *Safety of Medical Abortion Provided Through Telemedicine Compared with In Person*, 130 Obstetrics & Gynecology 778, 780 (2017).

[25] *Id.* at 782.

[26] Kate Grindlay, MSPH, and Daniel Grossman, M.D. *Telemedicine Provision of Medical Abortion in Alaska: Through the Provider's Lens*, J. of Telemedicine and Telecare OnlineFirst at 5 (2016).

**A Leading Medical and Public Health Authority Supports the Use of Telemedicine in the Provision of Medication Abortions**

146.    ACOG (the American College of Obstetricians and Gynecologists), a leading authority on women's health, supports the use of telemedicine to increase access to safe and effective medication abortions, stating that it "can be particularly beneficial to rural women, whose reproductive health needs can be underserved due to geographic limitations."[27]

147.    In a Practice Bulletin, ACOG advised clinicians that "[m]edical abortion can be provided safely and effectively via telemedicine with a high level of patient satisfaction."[28]

**Experience, Training, and the Safety Record of APNPs' Use of Telemedicine at PPWI Clinics Underscore Their Ability Safely to Provide Medication Abortion Care Using Telemedicine**

148.    APNPs at PPWI already offer a variety of medical services by telemedicine, including prescribing medications that are similar in risk level to the drugs required for a medication abortion.

149.    Since February 2009, PPWI has employed telemedicine to treat patients for non-abortion services, including for emergency contraception, treatment for sexually transmitted diseases, and treatment for presumed urinary tract infections.

150.    On average, approximately 140 telemedicine appointments occur each week at PPWI.

151.     These appointments are conducted by highly qualified clinicians, including advanced practice nurses.

---

[27] ACOG Statement Regarding Telemedicine Abortion (June 19, 2015), https://www.acog.org/About-ACOG/News-Room/Statements/2015/ACOG-Statement-Regarding-Telemedicine-Abortion.

[28] *Medical Management of First-Trimester Abortion*, Practice Bulletin No. 143 (ACOG, Washington, DC), March 2014, reaffirmed 2016, at 12, https://www.acog.org/Clinical-Guidance-and-Publications/Practice-Bulletins/Committee-on-Practice-Bulletins-Gynecology/Medical-Management-of-First-Trimester-Abortion.

152.    APNPs at PPWI currently prescribe medication via telemedicine.  After consulting with the patient, the remote APNP writes the prescription order in the patient's electronic record.  Next, a staff member at the patient's location obtains the medication.  This staff member then verifies the medication, dosage, and medication instructions with either an onsite clinician who has prescribing authority or with the remote APNP who originally prescribed the medication by video.

153.    If a physical exam is determined to be necessary during a telemedicine session, the exam is performed by PPWI staff at the patient's location and, before consulting with the patient, the remote clinician reviews the results of the exam using secure web-based software.

154.    PPWI is ready and able to expand its telemedicine services to allow PPWI physicians and APNPs to oversee the provision of medication abortion care using telemedicine.

155.    If the **Physical-Presence Restriction** were modified or lifted, PPWI could implement a telemedicine process that is virtually identical to the process currently used to provide medication abortion by in-person prescribers: (1) the patient would visit one of PPWI's clinics near her home; (2) qualified onsite staff would document the patient's medical history, take the patient's vital signs, and perform an ultrasound for pre-abortion screening; and (3) a physician or APNP at a different clinic who is qualified to provide early-term abortion care would review the patient file and ultrasound images and then consult with the patient by video. If the patient qualifies for and decides to have a medication abortion, the patient would return to her home clinic following the mandatory waiting period, and onsite staff would provide her with the mifepristone and misoprostol prescribed by the offsite physician or APNP, who is in contact via video.

156.    All PPWI clinics have the equipment to support telemedicine, which includes laptops, web cameras, and a secure software program.

157.    PPWI has the resources and is ready to purchase ultrasound equipment for more of its locations, so that it can perform the pre-abortion physical exam and confirm the gestational age of the fetus at these locations.  PPWI has the resources to train staff in the use of this equipment.

158.    PPWI also has the prescriber personnel to provide medication abortion telemedically.  As described above, PPWI already has 14 physicians who perform abortions and could provide medication abortion care via telemedicine.  PPWI also has 25 APNPs trained in managing miscarriages with misoprostol.  Four of those APNPs currently work in abortion care or have experience in abortion care.  The remaining APNPs could be trained to provide medication abortion care, including by telemedicine.

159.    PPWI, therefore, has the personnel and other resources necessary for safely implementing the telemedicine procedures already employed in other states to provide medication abortions.

## V.    THE IMPACT OF WISCONSIN'S ACCESS RESTRICTIONS ON PLAINTIFFS AND THEIR PATIENTS

160.    The **Access Restrictions** (the **Physician-Only Restriction**, the **Same-Physician Restriction**, and the **Physical-Presence Restriction**), individually and in combination, significantly impede access to abortion in the State of Wisconsin and cause medical, emotional, and financial harm to Wisconsin women.

161.    By prohibiting, without medical justification, experienced and capable advanced practice nurses from performing medication and aspiration abortions that they would otherwise be qualified to perform, the **Physician-Only Restriction** reduces the number of health care

providers who are able to perform medication and aspiration abortion, thereby limiting women's access to and choices regarding abortion care.

162.     Moreover, the **Same-Physician Restriction** and the **Physical-Presence Restriction**, by requiring the prescribing physician to perform the pre-abortion physical examination and to be physically present when a woman is given abortion-inducing drugs, further restrict PPWI's ability to offer medication abortions by restricting the number of available physicians who can treat patients in any location over multiple days.

163.     Although PPWI has 21 health centers around Wisconsin, PPWI is currently able to offer abortion services at only three of its facilities.

164.     There is only one non-PPWI outpatient clinic in Wisconsin that offers abortions: Affiliated Medical Services' center in Milwaukee.

165.     That means that Wisconsin currently has only four publicly accessible health centers where a woman can obtain a medication or aspiration abortion.  These four clinics are in just three cities (within three of Wisconsin's 72 counties): Madison (home to PPWI's Madison East facility), Milwaukee (home to PPWI's Water Street facility and the Affiliated Medical Services center), and Sheboygan (home to PPWI's Sheboygan facility).

166.     PPWI has a total of 14 physicians who provide abortion services: 5 physicians at the Water Street clinic in Milwaukee, 8 physicians at the Madison East clinic, and 1 physician at the Sheboygan clinic.  These physicians are employed by other facilities and, therefore, are able to work only limited hours at PPWI's clinics.

167.     The ability of PPWI to expand abortion services to its other clinics is significantly impeded by the need to find, and lack of, physicians who are willing and available to provide abortion care.

40

168.     However, PPWI already has 25 APNPs at its health centers who either already have the requisite training to provide medication abortion care, or would shortly be trained to provide medication abortions, if the **Physician-Only Restriction** was lifted.  Moreover, each of its clinics has medical professionals on staff who, if the **Physical-Presence Restriction** was removed, could give the mifepristone and misoprostol to a patient after it is prescribed by a physician or APNP at a different location using telemedicine.  PPWI also has advanced practice nurses who either could promptly begin providing aspiration abortions or would immediately seek training to be able to perform that procedure, if the **Physician-Only Restriction** did not exist.  The **Access Restrictions** currently preclude these advanced practice nurses from offering abortion services to the women of Wisconsin.

> A.     **Because of the Access Restrictions, Wisconsin Women Often Have to Travel Long Distances to Access Abortion Care, Which Many Cannot Afford**

169.     Roughly 72 percent of women in Wisconsin live in one of the 69 counties without a provider of abortion services, including the 32 poorest counties in the State.

170.     Wisconsin women in both rural and urban communities situated in these counties lack adequate access to abortion services.

171.     For example, a woman from Green Bay, the third largest city in Wisconsin in the third most populous county in the State, has to drive over an hour each way to obtain abortion care at the nearest outpatient abortion clinic, PPWI's Sheboygan facility.  The Sheboygan health center, however, provides only medication abortions and provides them approximately 6 days per month.  If the woman seeks a surgical abortion (the only option later in pregnancy) or cannot make one of the limited appointment times available at the Sheboygan facility, she would have to drive between 1.5 and three hours one way and three to six hours round trip to Milwaukee or Madison to obtain abortion care.

172.    A woman from Wisconsin Rapids, located in the central part of Wisconsin, must drive between approximately two and three hours one way (four to six hours round trip) to Milwaukee, Madison, or Sheboygan (or St. Paul, Minnesota) to obtain any abortion care.

173.    A woman in Vilas County, Wisconsin, the ninth poorest county in Wisconsin, must drive between three and 4.5 hours one way (six to nine hours round trip) to Milwaukee, Madison, or Sheboygan to obtain a medication or aspiration abortion.

174.    When a woman seeking abortion care does not have access to a private vehicle, the travel time to Milwaukee, Madison, or Sheboygan by public transportation (if even available) can take far longer and be much more expensive.

175.    Transportation costs and travel time are but two of multiple barriers inhibiting a woman's ability to travel to obtain abortion care.

176.    In most cases, after making the long journey to a state-mandated counseling appointment, the woman must then travel back home and make a second visit to the clinic at least 24 hours later because Wisconsin law requires a 24-hour waiting period between the counseling appointment and when she can receive a medication or aspiration abortion.

177.    Alternatively, a woman seeking an abortion must find and pay for overnight lodging between her two clinic visits.

178.    A woman seeking a medication or aspiration abortion must not only arrange and pay for transportation and/or lodging, but also arrange to take time off of work over multiple days to receive this medical care.  Low-wage workers often have no access to paid time off or sick days.  Even if a woman is able to take time off of work to obtain an abortion, she is likely to forego wages, which can be cost-prohibitive for poor and low-income women.

179.    A woman facing long-distance travel to access medication or aspiration abortion care typically must arrange and pay for child care as well, given that most abortion patients already have at least one child.

180.    Poverty is a significant problem in Wisconsin.  Over 12 percent of all Wisconsin residents, and 41.6 percent of single mothers in the State, have incomes at or below the federal poverty level ($12,140 per year for a single person and $20,780 per year for a family of three). The poverty rate is disproportionately high among women of color: 35.9 percent of African-American women, 28 percent of Latina women, and 26.6 percent of Native American women in Wisconsin lived in poverty between 2011 and 2013.

181.    Because the federal poverty level is widely considered to be an inadequate measure of poverty that does not take into account the cost of child care, medical expenses, utilities, or taxes, these statistics undercount the number of Wisconsin residents who are struggling to make ends meet and minimize the dire economic situation of women who meet the federal poverty standard.

182.    Due to a combination of factors, including relative lack of access to medical services and difficulty accessing and affording contraceptives, low-income women have more unintended pregnancies and higher abortion rates than women with higher incomes. Consequently, a disproportionately high percentage of women who seek abortions nationwide have poverty-level incomes.

183.    The same is true of patients seen at PPWI's clinics.  PPWI's poor and low-income patients routinely report that they do not have, and will not be able to find, the money they need to travel to a clinic in a different city for abortion care.

43

184.     Wisconsin's Medicaid program covers the cost of transportation to receive Medicaid-covered health services.  However, because Wisconsin's Medicaid program excludes coverage for abortion in almost all cases, PPWI's poor and low-income patients who are enrolled in or eligible for Medicaid cannot receive state assistance either for the cost of their abortions or for the cost of travel to their abortion-related appointments.

185.     As a result of the many restrictions on abortion care imposed by Wisconsin law, including the **Access Restrictions**, women are forced to spend time and money traveling long distances, which some woman simply cannot afford to do.  As a result, these women are forced to obtain riskier, more complex later-term abortions, instead of an aspiration or medication abortion.  Still others are simply unable to obtain an abortion at all and are instead forced to carry a pregnancy to term against their will.

> **B.     Wisconsin Women Can Access Abortion Care Only on a Limited Number of Days, Causing Delays and Other Forms of Harm, and Preventing Some Women from Accessing Abortion Care at All**

186.     The arbitrary limitations imposed by the **Access Restrictions** also curtail the number of days and windows of time during which PPWI can provide medication or aspiration abortions at its facilities to women in need of such care.

187.     In practice, the **Same-Physician Restriction** and the **Physical-Presence Restriction** mean that the same physician must be physically present in the same clinic on two separate days to provide medication abortion care to one patient.

188.     As a result, there are only 2–3 days per week when a woman can obtain a medication abortion at PPWI's Water Street clinic or PPWI's Madison East clinic, and there are no appointments for abortion care on evenings or weekends.  Appointments for an abortion are even more limited at the Sheboygan facility.

189.    PPWI's patients frequently request an appointment on a different day of the week. Unfortunately, because of the **Access Restrictions**, PPWI is almost never able to accommodate these requests.

190.    The scheduling difficulties created by the **Same-Physician Restriction** and **Physical-Presence Restriction** also create unnecessary delays in scheduling abortion-related appointments.  The average wait time for the first of the two appointments for a medication abortion can be up to 7 business days.  Because of this lengthy wait time, a woman who discovers she is pregnant at six weeks has only approximately 2.5 weeks to decide to have an abortion and to schedule the two appointments necessary to perform the medication abortion within the first 10 weeks of pregnancy.

191.    Moreover, because PPWI's 14 physicians must retain space in their schedules for two appointments to provide a single patient with medication abortion care, the number of days and appointments these physicians have available to perform aspiration abortions is further limited.

192.    Delays resulting from the **Access Restrictions** that prevent these women from obtaining medication abortions and require them to undergo surgical abortions can also be medically or emotionally harmful, or force these women to forego an abortion altogether.

193.    Delays in the provision of abortion services can mean the difference between obtaining a medication abortion (currently available at PPWI during the first 10 weeks of pregnancy) and a surgical abortion.  That can result in negative medical consequences for the patient.  Medication abortion is the recommended form of abortion for certain women (*e.g.*, women with certain uterine fibroids), and strongly preferred by others (*e.g.*, sexual assault

survivors for whom the insertion of instruments into the vagina may cause emotional and psychological trauma, or minors who have never had a pelvic exam performed).

194. Delays in access to abortion services can also mean the difference between receiving a medication or aspiration abortion or an abortion performed later in the woman's pregnancy. Given that the risks associated with abortion increase with each additional week of pregnancy (although they are still generally low), the delay in the provision of abortion care can have a meaningful and negative repercussion on women's health and well-being.

195. Additionally, the cost of an abortion increases as gestational age advances. Delays in access to medication and aspiration abortions caused by the **Access Restrictions** may result in additional costs to patients, which can be a serious burden, especially for low-income women.

196. The delays resulting from the **Access Restrictions** are often exacerbated by the time it takes poor and low-income patients to raise money for an abortion procedure (which, due to delays caused by the **Access Restrictions**, already may be more expensive than necessary) and the transportation and lodging costs associated with traveling to one of the few facilities where early abortion care is provided.

197. As a result of these factors, which are obvious consequences of the **Access Restrictions**, some patients are pushed past the point in pregnancy when they can obtain abortion care in the State.

198. The limited windows of appointment availability also present significant logistical challenges for the many patients who need to take time off of work and/or arrange for child care while they seek abortion-related care.

199.    The limited number of locations providing abortion care and the limited number of appointments for such care also make it more difficult for patients to maintain the confidentiality of their pregnancy and abortion decisions from employers, colleagues, neighbors, and those family members whom they decide not to inform.  For women in abusive relationships who need to keep their pregnancy and abortion decision secret, this can endanger their safety.

**C.    If Not for the Access Restrictions, Women Would Have Greater Access to Medication and Aspiration Abortion Care Throughout the State**

200.    If not for the **Access Restrictions**, PPWI advanced practice nurses could also provide medication and abortion services.

201.    In addition to the physicians who already provide abortions at PPWI facilities, PPWI has 25 APNPs who are trained to prescribe misoprostol for purposes of miscarriage management.  Four of these APNPs—including Plaintiffs Hartwig, Beringer, and Melde—have experience in abortion care and would immediately be able to perform medication abortions if the **Physician-Only Restriction** was lifted.  The other APNPs could also be trained to perform medication abortions; several could be so trained within a year.

202.    If the **Physician-Only Restriction** did not exist, Plaintiff Hartwig would promptly be able to perform aspiration abortions, and other advanced practice nurses at PPWI, including Plaintiffs Beringer and Melde, would undergo the training necessary to perform these procedures.

203.    In the absence of the **Access Restrictions**, PPWI would also be able to send a trained advanced practice nurse to its other clinics on an ad-hoc basis when there is patient need.

204.    As a result of broadening the number of providers permitted to perform medication and aspiration abortions, PPWI could expand abortion services at its three existing

47

outpatient abortion clinics and would be able to expand abortion care to additional clinics throughout the State within 12 to 24 months.

205.    Thus, absent the **Access Restrictions**, medication and aspiration abortion care would be available in Wisconsin during expanded hours and in more locations.

206.    Without the **Access Restrictions**, many more women in the State would be able to receive appropriate care in or near their own communities without the unnecessary expense and logistical challenges of traveling long distances.  Women who would otherwise find it impossible to obtain abortion care at a distant location will instead be able to access that care locally.

207.    Moreover, Wisconsin women would be able to obtain abortion care from the same advanced practice nurse in their community who provides them with other primary, gynecological, and/or prenatal care.

208.    This expanded access would dramatically reduce delays and the associated medical, emotional, and financial costs that women in Wisconsin must bear as a result of the **Access Restrictions**.

## CLAIMS FOR RELIEF

### COUNT I
### (Substantive Due Process—Patients' Right to Privacy)

209.    The allegations of Paragraphs 1 through 208 are incorporated as though fully set forth herein.

210.    The **Access Restrictions**, individually and collectively, violate Plaintiffs' patients' rights to liberty and privacy as guaranteed by the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution by imposing significant burdens on abortion access that are

not justified by the laws' purported benefits, thereby imposing an undue burden on a woman's right to have an abortion.

## COUNT II
### (Equal Protection—Plaintiffs)

211.    The allegations of Paragraphs 1 through 210 are incorporated as though fully set forth herein.

212.    The **Physician-Only Restriction** violates the equal protection rights of Plaintiffs, as guaranteed by the Fourteenth Amendment to the U.S. Constitution, by treating advanced practice nurses who seek to provide abortion services differently than advanced practice nurses who provide comparable health services, without any rational medical justification for doing so.

213.    The **Same-Physician Restriction** and the **Physical-Presence Restriction** violate the equal protection rights of Plaintiffs, as guaranteed by the Fourteenth Amendment to the U.S. Constitution, by treating physicians who prescribe medications to induce a medication abortion differently than physicians who prescribe comparable drugs or the same drugs for other medical purposes, without adequate justification.

214.    The **Physical-Presence Restriction** violates the equal protection rights of Plaintiffs, as guaranteed by the Fourteenth Amendment to the U.S. Constitution, by treating medical professionals who seek to use telemedicine to provide abortion services differently than medical professionals who use telemedicine to provide comparable health services, without adequate justification.

## COUNT III
### (Equal Protection—Plaintiffs' Patients)

215.    The allegations of Paragraphs 1 through 214 are incorporated as though fully set forth herein.

216.     The **Access Restrictions** violate the equal protection rights of Plaintiffs' patients, as guaranteed by the Fourteenth Amendment to the U.S. Constitution, by treating patients who seek medication and aspiration abortion care differently than patients who seek comparable health care services, without adequate justification.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

1.     Declare that the following statutes and regulation are unconstitutional:

    a.     Wis. Stat. § 940.15(5) (the "**Physician-Only Restriction**"), as applied to qualified advanced practice clinicians who seek to provide medication or aspiration abortions;

    b.     Wis. Stat. § 253.105(2)(a) (the "**Same-Physician Restriction**");

    c.     Wis. Stat. § 253.105(2)(b) (the "**Physical-Presence Restriction**");

    d.     The first sentence of Wis. Admin. Code Med. § 11.03, as applied to qualified advanced practice clinicians who seek to provide medication or aspiration abortions;

    e.     Wis. Stat. § 253.10(3)(b) to the extent it assumes or requires that a "physician . . . is to perform or induce the abortion" and is the only medical professional who can determine the voluntariness of a woman's consent to an abortion, thereby precluding advanced practice clinicians from performing medication or aspiration abortions or determining the voluntariness of a woman's consent to an abortion;

    f.     Wis. Stat. § 253.10(3)(c)(1) to the extent it assumes or requires that a "physician . . . is to perform or induce the abortion" and is the only medical professional who can orally inform the woman of the information

50

set forth in that statute, thereby precluding advanced practice clinicians from performing medication or aspiration abortions or orally informing the woman of the information set forth in that statute;

g.    Wis. Stat. § 253.10(3)(c)(2) to the extent it assumes or requires that a "physician . . . is to perform or induce the abortion" and that only a physician or a "person assisting the physician" can orally inform the woman of the information set forth in that statute, thereby precluding advanced practice clinicians from performing medication or aspiration abortions or orally informing the woman of the information set forth in that statute;

h.    Wis. Stat. § 940.04(5)(a), as applied to qualified advanced practice clinicians who seek to provide medication or aspiration abortions;

2.    Enjoin Defendants, their employees, agents, and successors in office from enforcing the statutory and regulatory provisions set forth in points (1)(a)-(h), *supra*, without bond;

3.    Award Plaintiffs costs and attorneys' fees, pursuant to 42 U.S.C. § 1988; and

4.    Grant Plaintiffs such other and further relief as the Court may deem just and proper.

Dated:  January 16, 2019                       Respectfully submitted,

                                                s/ Lester A. Pines_____


Susan J. Kohlmann*                              Lester A. Pines
Alison I. Stein*                               Tamara B. Packard
David B. Diesenhouse*                          Leslie Freehill
Emily A. Bruemmer*                             PINES BACH LLP
Jessica A. Martinez*                           122 West Washington Avenue,
JENNER & BLOCK LLP                             Suite 900
919 Third Avenue                               Madison, WI 53703
New York, NY 10022                             Phone:  608-251-0101
Phone:  212-891-1600                           lpines@pinesbach.com
skohlmann@jenner.com                           tpackard@pinesbach.com
astein@jenner.com                              lfreehill@pinesbach.com
ddiesenhouse@jenner.com
ebruemmer@jenner.com                           Diana O. Salgado*
jmartinez@jenner.com                           PLANNED PARENTHOOD FEDERATION OF AMERICA
                                               1110 Vermont Avenue, NW,
                                               Suite 300
                                               Washington, DC 20005
                                               Phone:  212-261-4399
                                               diana.salgado@ppfa.org


*Counsel for Plaintiffs*

*\* Application for Admission Pro Hac Vice Forthcoming*