## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

---

PLANNED PARENTHOOD OF
WISCONSIN, INC., *et al.*,

*Plaintiffs,*

v.

Case No. 19-cv-38

JOSHUA KAUL, *et al.*,

*Defendants*

---

## PLAINTIFFS' POST-TRIAL BRIEF

---

<div style="display:flex">
<div>

Susan J. Kohlmann
Alison I. Stein
Ali M. Arain
Lori B. Day
Jessica A. Martinez
Danielle Muniz
Emily S. Mannheimer
Kara V. Brandeisky
JENNER & BLOCK LLP
919 Third Ave
New York, NY 10022
Phone: 212-891-1600
skohlmann@jenner.com
astein@jenner.com
aarain@jenner.com
lday@jenner.com
jmartinez@jenner.com
dmuniz@jenner.com
emannheimer@jenner.com
kbrandeisky@jenner.com

</div>
<div>

Lester A. Pines
Tamara B. Packard
Leslie A. Freehill
PINES BACH LLP
122 West Washington Avenue,
Suite 900
Madison, WI 53703
Phone: 608-251-0101
lpines@pinesbach.com
tpackard@pinesbach.com
lfreehill@pinesbach.com

Diana O. Salgado
Richard Muniz
PLANNED PARENTHOOD FEDERATION OF
AMERICA
1110 Vermont Avenue, NW
Suite 300
Washington, DC 20005
Phone: 212-261-4399
diana.salgado@ppfa.org
richard.muniz@ppfa.org

*Counsel for Plaintiffs*

</div>
</div>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ ii

QUESTIONS PRESENTED ........................................................................... iv

ARGUMENT .................................................................................................. 1

   1.   *Mazurek v. Armstrong* Does Not Bar Plaintiffs' Challenge to the
Physician-Only Restriction .................................................................... 1

   2.   The Undue Burden Standard Does Not Require Proof of a Decrease
in the Abortion Rate or Other Quantification ................................... 5

   3.   The Availability of Out-of-State Abortions Should Have No Bearing
on this Court's Analysis of the Burden on Wisconsin Women ..................... 12

# TABLE OF AUTHORITIES[1]

CASES

*Falls Church Medical Center, LLC v. Oliver*, 412 F. Supp. 3d 668 (E.D. Va. 2019) ......................................................................................... 5

*J.D. v. Azar*, 925 F.3d 1291 (D.C. Cir. 2019) ............................................. 13

*Jackson Women's Health Org. v. Currier*, 760 F.3d 448 (5th Cir. 2014)................... 13

*June Medical Services L.L.C. v. Russo*, 140 S. Ct. 2103 (2020)............... 6, 7, 9, 11, 12

*Karlin v. Foust*, 188 F.3d 446 (7th Cir. 1999) ........................................ 1, 3, 4

*Mazurek v. Armstrong*, 520 U.S. 968 (1997)...................................... iv, 1, 2, 3

*Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992)............... 1, 2, 3, 6, 8, 11

*Planned Parenthood of the Great N.W. & the Hawaiian Islands v. Wasden*, 406 F. Supp. 3d 922 (D. Idaho 2019) ................................... 4, 5

*Planned Parenthood of Wis., Inc. v. Schimel*, 806 F.3d 908 (7th Cir. 2015) ....................................................................... 1, 7, 12, 13

*Planned Parenthood of Wis., Inc. v. Van Hollen ("Van Hollen III)*, 738 F.3d 786 (7th Cir. 2013) ............................................................... 7–8, 9

*Planned Parenthood of Wis., Inc. v. Van Hollen ("Van Hollen IV)*, 94 F. Supp. 3d 949 (W.D. Wis. 2015), *aff'd sub nom. Planned Parenthood of Wis., Inc. v. Schimel*, 806 F.3d 908 (7th Cir. 2015) ........................... 1, 9, 10, 15

*Planned Parenthood of Wis., Inc. v. Van Hollen ("Van Hollen II)*, 2013 WL 3989238 (W.D. Wis. Aug. 2, 2013) ................................................ 8, 9

*State of Missouri ex rel. Gaines v. Canada*, 305 U.S. 337 (1938) ............................ 13

*W. Ala. Women's Ctr. v. Miller*, 299 F. Supp. 3d 1244 (M.D. Ala. 2017)................... 13

*Whole Woman's Health v. Cole*, 790 F.3d 563 (5th Cir. 2015), *rev'd sub nom. Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016) ................... 13

*Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016) ... 3, 6–7, 8, 9, 10–11, 12

---

[1] Unless otherwise indicated, internal citations and quotations have been omitted from legal citations throughout the brief.

*Whole Woman's Health v. Lakey*, 46 F. Supp. 3d 673 (W.D. Tex. 2014) ..................... 9

*Whole Woman's Health Alliance v. Hill*, 2020 WL 5994460 (S.D. Ind. Oct. 9, 2020) ........................................................................................ 4

**STATUTES**

Wis. Stat. Ann. § 441.16(3) ........................................................................... 5

Wis. Stat. Ann. § 49.45(2)(a) ......................................................................... 5

**OTHER AUTHORITIES**

Wis. Admin. Code N. § 8.10 ........................................................................... 5

## QUESTIONS PRESENTED

Plaintiffs, by and through their undersigned attorneys, hereby submit this Post-Trial Brief ("Brief") responding to the three questions on which the Court requested additional briefing:

1.      Whether *Mazurek v. Armstrong*, 520 U.S. 968 (1997) (per curiam), bars Plaintiffs' challenge to the Physician-Only Restriction;[2]

2.      Whether the undue burden test requires proof of an actual decrease in the number of abortions as a result of the three laws at issue, or any quantification;

3.      Whether the existence of out-of-state abortion providers has any relevance to the Court's analysis of the burden that the three laws at issue impose.

---

[2] For expediency, this Brief adopts the relevant definitions and abbreviations contained in Plaintiffs' Pre-Trial Brief (Dkt. 72).

# ARGUMENT

### 1. *Mazurek v. Armstrong* Does Not Bar Plaintiffs' Challenge to the Physician-Only Restriction.

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) (per curiam), does not preclude this Court from finding that Wisconsin's Physician-Only Restriction is unconstitutional based on the *effects* it has on abortion access.

The Supreme Court has long held that an abortion restriction can be challenged on the basis that it has either the "purpose *or* effect of placing a substantial obstacle in the path of a woman seeking an abortion." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 877 (1992) (opinion of O'Connor, Kennedy, and Souter, JJ.) (emphasis added). Thus, while an abortion restriction may not have been enacted with an improper purpose (or motive), it may still impose an undue burden because of its *effect*s. The claims are distinct and require separate analysis. *E.g.*, *Karlin v. Foust*, 188 F.3d 446, 483, 493 (7th Cir. 1999); *Planned Parenthood of Wis., Inc. v. Van Hollen* ("*Van Hollen IV*"), 94 F. Supp. 3d 949, 994–95 (W.D. Wis. 2015), *aff'd sub nom. Planned Parenthood of Wis., Inc. v. Schimel*, 806 F.3d 908 (7th Cir. 2015). Here, Plaintiffs challenge the *effects* of the Physician-Only Restriction. *Mazurek*, on the other hand, strictly addressed whether Montana's "physician-only law was arguably invalid because its *purpose* . . . may have been to create a substantial obstacle to women seeking abortions." *Mazurek*, 520 U.S. at 972. The Supreme Court rejected the plaintiffs' improper purpose claim because it found no "evidence suggesting an unlawful motive on the part of the Montana Legislature." *Id*. The Court further refused to assume an improper motive

1

on the legislature's part even where there was no evidence of a health basis for the

law, reasoning that states generally have "'broad latitude to decide that particular

functions may be performed only by licensed professionals.'" *Id.* at 973 (quoting

*Casey*, 505 U.S. at 885). In other words, just because the Montana Legislature

passed a law requiring a certain type of medical professional to do a certain type of

procedure, this did not mean the legislature must have been acting with an

improper purpose. Because the Ninth Circuit did not disturb the district court's

effects holding that "there was 'insufficient evidence' in the record that the

requirement posed a 'substantial obstacle to a woman seeking an abortion,'" the

Supreme Court limited its holding to the improper purpose claim. *Id.* at 971–72.[3]

In *Casey,* however, the Court undertook an analysis of whether

Pennsylvania's physician-only informed consent requirement imposed an undue

burden based on its *effect*s. The Court upheld Pennsylvania's law because there was

"no evidence on th[e] record that requiring a doctor to give the information as

provided by the statute," as opposed to an unlicensed qualified assistant,[4] "would

---

[3] As further reason for finding the legislature did not have an improper motive, the Court noted that Montana PAs had previously only been allowed to perform abortions with a physician present, which meant that "no woman seeking an abortion would be required by the [challenged] law to travel to a different facility than was previously available." *Id.* at 974. By contrast, Plaintiffs here have established that APCs in Wisconsin would perform abortions independently such that abortion access would be greatly expanded and travel distances would be far shorter, if not for the Physician-Only Restriction. *See, e.g.*, Tr. (Dkt. 117) 84:13–85:1 (Williams).

[4] The language in *Casey* that states are generally permitted to decide that "particular functions may be performed only by *licensed* professionals" stems from Pennsylvania's law seeking to bar an *unlicensed* assistant from providing the state-mandated informed consent information. *Casey*, 505 U.S. at 884 (opinion of O'Connor, Kennedy, and Souter, JJ.) (emphasis added). In contrast, Plaintiffs here are seeking to allow licensed advanced practice clinicians to perform abortions.

amount in practical terms to a substantial obstacle." *Casey*, 505 U.S. at 884 (opinion of O'Connor, Kennedy, and Souter, JJ.). Thus, in neither *Casey* nor *Mazurek* did the Supreme Court hold that that all physician-only laws are *per se* constitutional regardless of the effect on abortion access. *See Karlin*, 188 F.3d at 484 (holding that plaintiffs were not precluded by *Casey* from challenging a Wisconsin law that requires physicians to provide certain state-mandated information to patients).

Simply put, the Supreme Court has never held that state legislatures have unchecked authority to impose any requirement it chooses on who may provide an abortion. *See, e.g.*, *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2310–11 (2016) (striking down law requiring physicians who provide abortions to have admitting privileges despite state's argument that requirement served a credentialing function). Indeed, the *Mazurek* Court made clear that future plaintiffs may be able to succeed in challenging other states' physician-only restrictions. *Mazurek*, 520 U.S. at 975–76 ("[P]laintiffs in the Ninth Circuit seeking to challenge those States' [physician-only] laws may well be able to meet the threshold 'fair chance of success' requirement . . .").

To hold that all physician-only laws are *per se* constitutional would also run counter to the Supreme Court's directive that district courts have an obligation to "consider[] the evidence in the record." *Whole Woman's Health*, 136 S. Ct. at 2310; *see also Karlin*, 188 F.3d at 484–85 (holding district courts "must undertake an individualized factual inquiry based on the record" to afford women "a fair shake"). As the Seventh Circuit has elaborated, "[s]tates differ in the number of physicians

3

who perform abortions, the number of abortion facilities, the distances women must travel in order to reach an abortion facility, and the average income of women seeking abortions," which means "a similar provision in another state's abortion statute could well be found to impose an undue burden on women in that state depending on the interplay of factors such as those identified above." *Id.* at 485.

Indeed, since *Mazurek*, several federal district courts have likewise found that physician-only restrictions are not *per se* constitutional, but require individualized scrutiny, particularly when the factual circumstances on the ground have changed. For example, in *Whole Woman's Health Alliance v. Hill*, a district court recently denied Indiana's motion for summary judgment on a physician-only claim, explaining, "*Mazurek*'s conclusion [was] limited to challenges to the legislature's purpose, where it has been determined that the challenged statute does not, in effect, create burdens for women accessing abortion services." 2020 WL 5994460, at *35 (S.D. Ind. Oct. 9, 2020). The court added, "Indiana's statute has a broader reach than did Montana's statute in *Mazurek*." *Id.* Likewise, in *Planned Parenthood of the Great N.W. & the Hawaiian Islands v. Wasden*, in denying a motion to dismiss a challenge to Idaho's physician-only law, a district court ruled that *Mazurek*'s holding about "one state's physician-only statute on one set of facts does not close the courthouse door to Idaho plaintiffs." 406 F. Supp. 3d 922, 928 (D. Idaho 2019). The district court reasoned that since *Mazurek*, the FDA had "approved safe and legal medication abortion," and the state had "broadened APCs'

4

scope of practice,"[5] such that the facts of the case before the court were "significantly different from those the Supreme Court considered in *Mazurek* on both sides of the undue burden scale." *Id.* at 928–29. Even *Falls Church Medical Center, LLC v. Oliver*—which Defendants cited in their pretrial brief, Defs.' Pretrial Br. at 14 (Dkt. 68)—did not hold that *Mazurek* barred all challenges to physician-only restrictions, but instead found on the trial record that Virginia's physician-only restriction was not an undue burden. 412 F. Supp. 3d 668, 688–92 (E.D. Va. 2019).

In sum, consistent with precedent, this Court should conduct an individualized inquiry in assessing Wisconsin's Physician-Only Restriction, and—based on the record established in this case—find the Physician-Only Restriction unconstitutional.

## 2. The Undue Burden Standard Does Not Require Proof of a Decrease in the Abortion Rate or Other Quantification.

The undue burden standard does not require proof of a change in the number of abortions caused by a challenged law or otherwise require quantification of the burdens a law places on women seeking abortion.

*First*, the Court does not require proof of a change in the abortion rate for a plaintiff challenging an abortion restriction to prevail; the Supreme Court has never limited the burden analysis to just the number of women prevented from obtaining

---

[5] Wisconsin too has repeatedly expanded APCs' scope of practice. *E.g.*, Wis. Stat. Ann. § 441.16(3) (enacted Mar. 8, 1994) (permitting certain registered nurses to prescribe drugs); Wis. Admin. Code N. § 8.10(7) (promulgated Aug. 31, 2000) (permitting APNPs to "deliver health care services within the scope of the practitioner's professional expertise"); Wis. Stat. Ann. § 49.45(2)(a) (amended Nov. 30, 2017) (expanding Medicaid payments to services ordered by APNPs and PAs).

an abortion. *See, e.g., June Med. Servs. L.L.C. v. Russo*, 140 S. Ct. 2103, 2129 (2020) (plurality opinion) ("Those women not altogether prevented from obtaining an abortion would face other burdens."). The standard is undue burden, not complete obstacle. *Casey*, 505 U.S. at 877 (opinion of O'Connor, Kennedy, and Souter, JJ.). A law may be an undue burden if, for example, it has the effect of there being "fewer doctors, longer waiting times, and increased crowding," *Whole Woman's Health*, 136 S. Ct. at 2313; *accord June Med.*, 140 S. Ct. at 2129 (plurality opinion); *id.* at 2140 (Roberts, C.J., concurring in the judgment); "difficulty affording or arranging for transportation and childcare on the days of . . . clinic visits [and] increased travel distance," *id.*; "increased cost" of the abortion, *Casey*, 505 U.S. at 901; and increased medical risk from delayed care, including losing the option for a "noninvasive medication abortion," *June Med.*, 140 S. Ct. at 2130 (plurality opinion); *id.* at 2140 (Roberts, C.J., concurring in the judgment) ("increased associated health risk").

*Second*, the Supreme Court has never required quantification to determine either (i) whether the burdens a law imposes are undue, or (ii) whether a law that imposes an undue burden does so on a large fraction of affected women, such that facial relief is warranted. As to whether burdens imposed are undue, the Supreme Court has invalidated abortion restrictions based on evidence of whether those laws actually provided health benefits and the burdens those laws imposed, without quantifying the number of women the laws burdened.[6] *Whole Woman's Health*, 136

---

[6] *Casey*'s undue burden test does not require a quantified threshold showing, because in applying the test, "courts [must] consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Whole Woman's Health*, 136 S. Ct. at 2309. As

S. Ct. at 2318 (concluding that "the surgical-center requirement, like the admitting-privileges requirement, provides few, if any, health benefits for women, poses a substantial obstacle to women seeking abortions, and constitutes an 'undue burden' on their constitutional right to do so"); *June Med.*, 140 S. Ct. at 2132 (plurality opinion) (affirming that the Louisiana restriction "poses a 'substantial obstacle' to women seeking an abortion," "offers no significant health-related benefits," and "consequently imposes an 'undue burden' on a woman's constitutional right to choose to have an abortion"); *id.* at 2139 (Roberts, C.J., concurring in the judgment) (concluding law was unconstitutional "[b]ecause Louisiana's admitting privileges requirement would restrict women's access to abortion to the same degree as Texas's law"). Indeed, the Court has concluded that a law imposes an undue burden based on evidence that is not always susceptible to quantification.

In assessing undue burden, the Supreme Court has further made clear that the various burdens on access (which again, are not limited to *complete* obstacles) are "taken together," and their cumulative effects on abortion access are considered. *See Whole Woman's Health*, 136 S. Ct. at 2313 (holding that increased driving distance is "but one additional burden"); *Planned Parenthood of Wis., Inc. v. Van Hollen* ("*Van Hollen III*"), 738 F.3d 786, 796 (7th Cir. 2013) ("When one abortion regulation compounds the effects of another, the aggregate effects on abortion rights

---

the Seventh Circuit observed in *Schimel*, a burden is "undue" (or "excessive") if it "significantly exceeds what is necessary to advance the state's interests." *Schimel*, 806 F.3d at 919. A burden is more likely to be "disproportionate to the benefits and therefore excessive" the "feebler the medical grounds" for the law. *Id.* at 920. But even the test adopted by Chief Justice Roberts in *June Medical* does not require quantification, as discussed above.

must be considered."); *see also Planned Parenthood of Wis., Inc. v. Van Hollen* ("*Van Hollen II*"), 2013 WL 3989238, at *16–17 (W.D. Wis. Aug. 2, 2013) (finding that "adding *another* 100 miles or more to Madison or Milwaukee may well be prohibitive for a substantial fraction of patients" due to increased tangible and intangible costs such as gas, "payment for childcare and overnight accommodations and lost earnings," "stress and worry attendant with prolonged trips (and additional delays due to car trouble or weather issues)"). A law's effect must also be considered in light of women's lived experiences, including women with low incomes and rural women, *see Whole Woman's Health*, 136 S. Ct. at 2302 (noting that the laws "erect a particularly high barrier for poor, rural, or disadvantaged women"), and women who are victims of intimate partner violence, *see Casey*, 505 U.S. at 887–93 (opinion of O'Connor, Kennedy, and Souter, JJ.).

Nor does the "large-fraction" analysis applied to determine whether facial relief is appropriate require quantification of the number of women burdened. *Casey* facially invalidated the spousal-notification requirement, finding that an unspecified "significant number of women . . . [were] likely to be deterred from procuring an abortion" if forced to notify a spouse. *Id.* at 894. Although the number of women affected in *Casey* amounted to "fewer than one percent of women seeking abortions," the Court struck down the law because it "operate[d] as a substantial obstacle" for "a large fraction of the cases in which [it was] relevant" without quantifying how many of the affected women would face such obstacles. *Id.* at 894–95.

The bottom line is that neither the Supreme Court nor the Seventh Circuit

(nor this Court) has defined "substantial," "significant," or "large" in numerical terms. Indeed, the Court in *Whole Woman's Health* upheld a permanent injunction, based on the district court's finding that the laws affected "a significant, but ultimately unknowable, number of women throughout Texas." *Whole Woman's Health v. Lakey*, 46 F. Supp. 3d 673, 686 (W.D. Tex. 2014); *see Whole Woman's Health*, 136 S. Ct. at 2313, 2320; *accord Van Hollen II*, 2013 WL 3989238, at *16 n.30 (finding that a "significant minority" of all women seeking abortions likely would be "*substantially* impacted"); *Van Hollen IV*, 94 F. Supp. 3d at 993 (finding law would prevent "a substantial number of women" from obtaining a safe, legal abortion);[7] *see also Van Hollen III,* 738 F.3d at 798 ("It is not a matter of the number of women likely to be affected.").

Taking this all together, here, the evidence amply shows the Access Restrictions have imposed an undue burden on a large fraction of affected women. As an initial matter, although a "complete" obstacle is not required, the Court heard testimony that the Access Restrictions currently *do* prevent a significant number of women in Wisconsin from obtaining an abortion. But for the Restrictions, PPWI would offer abortion services at its 24 current health centers across the state, plus two new centers (up from PPWI's three current clinics in Milwaukee, Madison, and Sheboygan). Tr. (Dkt. 117) 103:25–104:4, 105:16–20. Dr. Fletcher's statistical

---

[7] Defendants are incorrect that "the proper denominator is all women." Defs.' Pretrial Br. at 19 (Dkt. 68). The Court has twice rejected an "every" or "all" woman standard. *See June Med.*, 140 S. Ct. at 2133 (plurality opinion); *Whole Woman's Health*, 136 S. Ct. at 2320. There is similarly no support for their suggestion that a state could prevent just south of 50% of women from obtaining an abortion without running afoul of the Constitution.

analysis also showed that approximately 30% of women in three exemplar counties—where PPWI would offer abortion services but for the Access Restrictions—are presently being prevented from obtaining an abortion. *See* Ex. 44, Fletcher Report ¶¶ 59, 63, 67 [hereinafter Fletcher Report]. As this Court found in *Van Hollen IV*, preventing 18% to 24% of women from obtaining an abortion renders a law facially unconstitutional. *Van Hollen IV*, 94 F. Supp. 3d at 992.

The 2018 increase in abortions in Wisconsin also shows that the Access Restrictions impose significant burdens and that unmet need exists in the state. PPWI began providing medication abortion services at its Sheboygan health center in May 2018. Fletcher Report ¶ 13. The Wisconsin Department of Health Services' report on "Reported Induced Abortions in Wisconsin, 2018" found a 7% increase in abortions in 2018 compared to 2017. Ex. 503 at 2. The report also showed that although the abortion rate remained constant from 2015 through 2017 (5.0), it increased in 2018 (5.6). *Id.* at 16 tbl.17. The fact that the abortion rate increased only in 2018, after the Sheboygan clinic opened, demonstrates that when additional health centers open in parts of the state where no clinics exist, and patients have to travel shorter distances to get an abortion, the abortion rate increases. Despite this recent improvement, the Sheboygan center has not met the statewide demand for abortions. *See* Tr. (Dkt. 117) 99:4–100:4, 110:18–111:4 (Williams); Fletcher Report ¶¶ 59, 63, 67.[8]

---

[8] Indeed, the Supreme Court has credited evidence that a limited pool of abortion providers, concentrated in few parts of the state, cannot meet statewide demand as supported by common sense. *Whole Woman's Health*, 136 S. Ct. at 2318 (crediting the "commonsense

In addition, the evidence showed burdens that are undue, separate from outright prevention. The evidence showed that the Access Restrictions deprive about half of PPWI patients who want a medication abortion from obtaining one, *see, e.g.*, Tr. (Dkt. 114) 59:11–15 (Beringer); force some women into a more expensive aspiration procedure, which for some women carries greater risk, *see, e.g.*, Tr. (Dkt. 117) 77:10–24 (Williams); Ex. 45, Grossman Report ¶ 83 [hereinafter Grossman Report]; and force patients to delay care, which increases the medical risk, *see, e.g.*, Tr. (Dkt. 117) 9:21–11:12 (King); Grossman Report ¶ 76. In addition, a significant number of women of reproductive age currently must travel large distances to obtain an abortion in Wisconsin, and those distances would significantly drop for a large number of Wisconsin women under PPWI's access plan. [9] *See* Exs. 212–215, 231–237.[10] This evidence is consistent with the evidence on which the Court relied in *Whole Woman's Health*. There, the only numerical

inference that the dramatic decline in the number of available facilities will cause a shortfall in capacity"); *see also Casey*, 505 U.S. at 887–93 (opinion of O'Connor, Kennedy, and Souter, JJ.) (relying on expert testimony, empirical studies, and common sense in determining impact of spousal-notification law). Defendants' own expert witness agreed that restrictions that reduce the supply of abortion clinics have been effective in decreasing abortion rates by preventing women from obtaining abortions, and that restrictions that increase travel distance in particular decrease the abortion rate. *See* Tr. (Dkt. 115) 6:18–7:7, 7:17–9:13, 31:16–21, 39:12–21 (New).

[9] The effects of the Access Restrictions are "magnified" due to Wisconsin's two-trip law. *June Med.*, 140 S. Ct. at 2130 (plurality opinion).

[10] The percentage of Wisconsin women of reproductive age located 50 miles or more (one way) from the nearest PPWI abortion provider would drop from 39% to less than 10% under PPWI's access plan if the Access Restrictions were struck down. The percentage of those located 100 miles or more (one way) from the nearest PPWI abortion provider would drop from about 23% to less than 2%. *See* Ex. 236. Further, while out-of-state clinics providing abortion services are legally irrelevant, the evidence shows that 36% of women of reproductive age are located 50 miles or more from the nearest clinic in or out of state, which would drop to less than 7% under PPWI's access plan. *See* Ex. 237. Thus, accounting for out-of-state clinics does not materially change the analysis. *See infra* Section 3.

evidence the Court relied on was (1) the change in the number of abortion centers caused by the restrictions, and (2) the number of women of reproductive age who experienced an increase in travel distance due to a facility closure.[11] *See* 136 S. Ct. at 2301–02, 2313; *see also June Med.*, 140 S. Ct. at 2140 (Roberts, C.J., concurring in the judgment). Similarly, here, the changes in distances that will occur under PPWI's access plan if the Access Restrictions are enjoined would be drastic.

But for the Access Restrictions (which like the restrictions invalidated in *Whole Woman's Health* and *June Medical* do nothing to enhance patient safety), (i) a significant number of Wisconsin women would be able to obtain an abortion and (ii) many more would be able to do so without hurdling substantial barriers erected by the Access Restrictions, including traveling long distances.

### 3. The Availability of Out-of-State Abortions Should Have No Bearing on this Court's Analysis of the Burden on Wisconsin Women.

Lastly, contrary to Defendants' assertions at trial, *see* Tr. (Dkt. 117) 132:15–133:1, this Court may not uphold the Access Restrictions based on the availability of out-of-state abortion providers. But, even if the Court considered out-of-state access, the Restrictions still unduly burden abortion access in Wisconsin.

In *Schimel*, the Seventh Circuit rejected the same argument the State advances here: that Wisconsin's abortion restrictions do not burden women because

---

[11] For example, the Court credited the district court's finding that the share of women of reproductive age "living more than 100 miles has increased by 150% (from 400,000 to 1 million)" during the period before and after the admitting privileges law took effect. 136 S. Ct. at 2302. The magnitude of the effect is much greater in this case: the share of women of reproductive age living 100 miles or more from a PPWI abortion provider would decrease by over 92% under PPWI's access plan, and the share living 100 miles or more from the nearest clinic in- or out-of-state would decrease by over 99%. *See* Exs. 236, 237.

women can simply travel out of state. 806 F.3d at 918. The court held the State's position as "untenable" because "the proposition that the harm to a constitutional right [can be] measured by the extent to which it can be exercised in another jurisdiction . . . [is] a profoundly mistaken assumption." *Id.* Other courts have held that states may not shirk their constitutional obligations on other states. *See, e.g.*, *J.D. v. Azar*, 925 F.3d 1291, 1331 (D.C. Cir. 2019) (rejecting government's argument that unaccompanied minors could voluntarily leave the country should they wish to have an abortion because "[t]he undue-burden framework has never been thought to tolerate any burden on abortion the government imposes simply because women can leave the jurisdiction"); *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 457 (5th Cir. 2014) ("[*State of Missouri ex rel. Gaines v. Canada*, 305 U.S. 337 (1938)] locks the gate for Mississippi to escape to another state's protective umbrella and thus requires us to conduct the undue burden inquiry by looking only at the ability of Mississippi women to exercise their right within Mississippi's borders."); *W. Ala. Women's Ctr. v. Miller*, 299 F. Supp. 3d 1244, 1261 n.11 (M.D. Ala. 2017) ("Moreover, although some women in Alabama could continue to access abortions beginning at 15 weeks by traveling out of state, courts have refused to allow out-of-jurisdiction access to cure within-jurisdiction restrictions.").[12]

---

[12] *Whole Woman's Health v. Cole*—which upheld challenged abortion restrictions in part because some "Texas women regularly choose to have an abortion in New Mexico independent of the actions of the State"—was overturned. *See Whole Woman's Health v. Cole*, 790 F.3d 563, 596–97 (5th Cir. 2015) (emphasis omitted), *rev'd sub nom. Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016). The Supreme Court's reversal of *Cole* suggests its disapproval of this argument.

Defendants' insistence on the relevance of out-of-state providers is misplaced for several other reasons. First, while presently some women in Western and Southeastern Wisconsin, as well as the far Northern parts of the state, live closer to an out-of-state abortion provider, most of the women in these areas live closer to one of PPWI's 24 health centers than the out-of-state provider. *Compare* Ex. 231 (showing driving distances to nearest clinic in- or out-of-state), *with* Ex. 233 (showing driving distances under PPWI's access plan). Thus, if the Access Restrictions were struck, women in La Crosse County, for example, would be able to obtain an abortion a short distance from where they live, instead of traveling over 70 miles, one way, to Rochester, Minnesota.[13]

Second, the evidence showed that even taking into consideration out-of-state clinics, a significant number of women are prevented or otherwise substantially burdened by the Access Restrictions. Dr. Fletcher's analysis showed that a significant number of Wisconsin women are prevented from obtaining an abortion because of travel distance-related barriers, even taking into account that the nearest clinic may be out-of-state. Fletcher Report ¶¶ 15–16.[14] His analysis showed that a change in distance from being less than 25 miles to between 50 and 100 miles

---

[13] As Exhibits 217, 218, and 219 show, some women for whom an out-of-state provider is closer prefer to obtain an abortion in state and travel to a PPWI health center that provides abortions to obtain one.

[14] Dr. Fletcher's underlying methodology included out-of-state clinics when calculating travel distance to the nearest clinic. *Id.* ¶¶ 18–19. Dr. Fletcher further concluded that access to out-of-state abortions did not have a material impact on his analysis, because (a) the number of out-of-state abortions performed on Wisconsin residents was not enough to explain changes to the in-state abortion rate and (b) the results of his regression analysis remained substantially similar even if the Wisconsin counties for which the nearest clinic was out of state were excluded. *Id.* ¶ 36.

of the nearest clinic reduced abortions by 25.9%. *Id.* ¶ 7. In addition, 36% of Wisconsin women of reproductive age—accounting for almost 390,000 Wisconsin women—live in a county that is 50 miles or more from the nearest abortion clinic. But for the Restrictions, less than 7% of such women would live in a county 50 miles or more from the nearest (in- or out-of-state) clinic, and less than 0.1% of such women would live in a county 100 miles or more from the nearest clinic. Ex. 237.[15]

Third, because the Restrictions prevent many women from obtaining an abortion in Wisconsin, the Court should consider the burdens the Restrictions place on them from having to travel out of state—just as it did in *Van Hollen IV*. There, this Court observed that travel to another state to seek abortion care is accompanied by financial burdens, as well as "stress of travel to an unfamiliar area, and difficulties encountered in trying to keep the reason for the travel confidential from a boss, co-workers or an abusive partner." 94 F. Supp. 3d at 991. Thus, for a significant number of women in Wisconsin, even if the closest clinic is out-of-state, the burdens associated with traveling to that clinic are substantial.

---

[15] By contrast, 39% of Wisconsin women of reproductive age live in a county that is 50 miles or more from the nearest in-state PPWI abortion center, and 23% live in a county 100 miles or more away. But for the Access Restrictions, less than 10% of such women would live in a county 50 miles or more from the nearest in-state PPWI provider, and less than 2% of such women would live in a county 100 miles or more away. Ex. 236.

Respectfully submitted on this 21st day of December, 2020.

By: */s/ Ali M. Arain*
Susan J. Kohlmann
Alison I. Stein
Ali M. Arain
Lori B. Day
Jessica A. Martinez
Danielle Muniz
Emily S. Mannheimer
Kara V. Brandeisky
JENNER & BLOCK LLP
919 Third Ave
New York, NY 10022
Phone: 212-891-1600
skohlmann@jenner.com
astein@jenner.com
aarain@jenner.com
lday@jenner.com
jmartinez@jenner.com
dmuniz@jenner.com
emannheimer@jenner.com
kbrandeisky@jenner.com

Lester A. Pines
Tamara B. Packard
Leslie A. Freehill
PINES BACH LLP
122 West Washington Avenue,
Suite 900
Madison, WI 53703
Phone: 608-251-0101
lpines@pinesbach.com
tpackard@pinesbach.com
lfreehill@pinesbach.com

Diana O. Salgado
Richard Muniz
PLANNED PARENTHOOD
FEDERATION OF AMERICA
1110 Vermont Avenue, NW
Suite 300
Washington, DC 20005
Phone: 212-261-4399
diana.salgado@ppfa.org

16

richard.muniz@ppfa.org

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that service of this document will be perfected upon the following counsel of record via ECF filing on December 21, 2020:

Brian P. Keenan
Clayton P. Kawski
Jennifer Lynn Vandermeuse

*/s/ Lori B. Day*